PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 13-1549 and 13-2236
_____

BYRON HALSEY,

                                        Appellant

                        v.

FRANK PFEIFFER; GERALD ALSTON; PETER
BRANNON; RUSSELL COLUCCI; KEVIN CONNORS;
GERALD COURTNEY; RAYMOND LYNCH; JOHN
PROPSNER; EDWARD SANTIAGO; JOHN DOES NOS
1-100; RICHARD ROES NOS 1-10; PLAINFIELD
POLICE DEPARTMENT; CITY OF PLAINFIELD;
COUNTY OF UNION
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 2-09-01138)
Hon. Dennis M. Cavanaugh, District Judge
_____

Argued December 18, 2013

BEFORE: JORDAN, VANASKIE, and GREENBERG,
Circuit Judges

(Filed: April 24, 2014)
_____

OPINION OF THE COURT
_____

David Rudovsky, Esq. (argued)
Jonathan H. Feinberg, Esq.
Kairys Rudovsky Messing & Feinberg, LLP
718 Arch Street, Suite 501 South
Philadelphia, PA 19106

Peter J. Neufeld, Esq.
Emma Freudenberger, Esq.
Anna Benvenutti Hoffmann, Esq.
Neufeld Scheck & Brustin, LLP
99 Hudson Street, 8th Floor
New York, NY 10013

   Attorneys for Appellant

Edward J. Kologi, Esq.
Michael S. Simitz, Esq. (argued)
Kologi & Simitza
923 N. Wood Avenue
Linden, NJ 07036

   Attorneys for Appellee Frank Pfeiffer

Robert F. Varady, Esq. (argued)

2

LaCorte, Bundy, Varady & Kinsella
989 Bonnel Court
Union, NJ 07083

Attorney for Appellee Raymond Lynch

GREENBERG, Circuit Judge

## I. INTRODUCTION

The facts underlying this appeal—many of which are undisputed—are hardly believable. Plaintiff-Appellant, Byron Halsey, a young man with limited education, learned that the two small children for whom he had been caring had been tortured and murdered. He wanted to help in the investigation of these heinous crimes but found himself isolated in a police interview room, accused of the murders, told he had failed a polygraph examination (that we now know he passed), and confronted with false incriminating evidence. For a time he maintained his innocence, but, after being interrogated for a period extending over several days, and in a state of great fear, he signed a document purporting to be his confession to the crimes. Subsequently, he was charged, indicted, convicted, and sentenced to prison for two life terms. But his "confession" contained details that the investigators must have inserted because Halsey could not have known them. And the real killer, though he had a record of sexual assaults, was known to the police, and was an obvious potential suspect as he lived in an apartment next to the one that Halsey, the children, and their mother occupied, avoided arrest despite nervously asking the

3

investigating detectives whether he would be "locked up." Finally, after 22 years the State of New Jersey released Halsey from prison, not because trial error cast doubt on the result of his criminal trial, but because it had been established beyond all doubt that he had not committed the offenses. Except when an innocent defendant is executed, we hardly can conceive of a worse miscarriage of justice.

After his release, Halsey filed this civil action under 42 U.S.C. § 1983 with supplemental state-law claims alleging that state actors and entities involved in his prosecution had violated his constitutional rights. The defendants included, inter alia, defendants-appellees Frank Pfeiffer and Raymond Lynch, the two investigating police officers who Halsey claims (1) fabricated the oral confession that led to the prosecutor filing charges against him, (2) maliciously prosecuted him, and (3) coerced him into signing the fabricated confession, which was the critical evidence at his criminal trial. On appellees' motions for summary judgment, the District Court entered judgment in their favor on all three claims on February 21, 2013, because the Court believed that they had qualified immunity from Halsey's claims. Halsey v. Pfeiffer, Civ. No. 09-1138, 2013 WL 646200 (D.N.J. Feb. 21, 2013) (Halsey). Halsey then filed this appeal.

We will reverse and remand the case to the District Court for further proceedings. First, we reaffirm what has been apparent for decades to all reasonable police officers: a police officer who fabricates evidence against a criminal defendant to obtain his conviction violates the defendant's constitutional right to due process of law. Second, we reinstate Halsey's malicious prosecution claim, principally because the prosecutor

4

instrumental in the initiation of the criminal case against Halsey has acknowledged that the false confession that appellees claimed they obtained from Halsey contributed to the prosecutor's decision to charge Halsey, and for that reason we will not treat the decision to prosecute as an intervening act absolving appellees from liability. Moreover, without that false confession, there would not have been direct evidence linking Halsey to the crimes so that the prosecutor would not have had cause to prosecute Halsey. Therefore, the District Court should not have held on the motions for summary judgment that appellees had a probable cause defense to Halsey's malicious prosecution claim. Third, we conclude that because the evidence was sufficient for a rational jury to find that appellees, who had interrogated Halsey for many hours, had coerced him into signing the false confession, the Court should not have granted appellees a summary judgment on Halsey's coercion claim.

## II. FACTUAL BACKGROUND

The record that the parties submitted to the District Court on appellees' motions for summary judgment contains some disputed facts that we recount, as we must, in the light most favorable to Halsey, who was the non-moving party, though in doing so we do not ignore undisputed facts favorable to appellees. We emphasize, however, that we are not deciding that appellees are liable to Halsey as we cannot be certain of what evidence the parties will introduce at trial, and that evidence may vary significantly from the evidence before the

5

District Court on the motions for summary judgment. In any event, Halsey did not file a cross-motion for summary judgment and even now does not contend that he is entitled to a judgment in his favor without a trial.

The record, as now developed, shows that on the morning of Friday, November 15, 1985, the superintendent of the apartment building in Plainfield, Union County, New Jersey, in which Halsey resided, discovered the body of eight-year-old Tyrone Urquhart who had been murdered in the building's basement. The superintendent notified the police, and when the officers arrived at the apartment house, they also found in the basement the body of Tyrone's seven-year-old sister, Tina, who like Tyrone, had been murdered. Tina had been raped, beaten, and strangled to death; Tyrone had been sexually assaulted, mutilated with scissors, and killed with five large nails hammered into his brain. It is difficult to imagine more brutal crimes. The killer was Halsey's friend and next-door neighbor, Clifton Hall, who had a prior record for attempted sexual assault. Naturally and appropriately, the police interviewed Hall who, at that time, appeared to be nervous and asked whether he was "going to be locked up." J.A. 627.[1] But Hall need not have been worried about that possibility because the investigators focused their attention almost immediately on Halsey, and, so far as we can ascertain from the record, they did not actively treat Hall as a suspect.

---

[1] J.A. refers to the parties' joint appendix and D.A. refers to appellees' supplemental appendix.

Halsey, who had been living with Margaret Urquhart, the mother of Tyrone and Tina, in the apartment building, considered her children to be his own. Halsey, however, was not a model citizen as he had a record that included numerous arrests, though most were not for violent crimes and none had resulted in his incarceration. At the time of the children's murders, Halsey was 24 years old with only a sixth-grade education, and was, by his own account, not "a good reader." J.A. 270. Indeed, in 1988 he tested in the "Mildly Mentally Retarded" range of intellectual functioning, with an I.Q. score of 68. J.A. 890. Pfeiffer was aware of Halsey's cognitive limitations.[2] Halsey had worked as a superintendent until about a week before the murders in the building where he, Urquhart, and the children lived and during that employment had access to the basement where the bodies were found. But, as he later would tell Pfeiffer, he had relinquished the basement keys prior to the murders and we do not know if he continued to have access to the basement after his employment as superintendent ended.

Halsey was at his new job at another location when Urquhart telephoned him and told him that her son was dead. Understandably, he rushed home to his apartment, which he

[2] As Halsey's false-confession expert notes, Halsey had tested higher as a child (77) and later, as an adult (94). As we will see, however, the important matter with respect to Halsey's mental limitations is Halsey's mental capacity at the time he confessed as well as appellees' perception of that capacity. To that end appellees do not dispute that Halsey was, and appeared to them to have been, mentally limited.

7

immediately discovered to be a crime scene. Pfeiffer and other detectives intercepted him and required him to accompany them to the police station for questioning, which Halsey reluctantly did.

Because the events that transpired once Halsey arrived at the police station that Friday morning were critical to the disposition of the summary judgment motions and are critical on this appeal, we recite them at length. The detectives took Halsey to an interview room in the police station, read his <u>Miranda</u> rights to him, handed him a <u>Miranda</u> waiver form, and left him alone to decide whether to sign the waiver. After Halsey signed the waiver, Pfeiffer and Lynch returned to ask him questions, and Halsey's answers were the first of three statements that Halsey either gave or which was attributed to him.

In the first statement, Halsey told the detectives—in significant detail—about his activities the night of the murders. Halsey stated that Urquhart left to play bingo and then went straight to work for a night shift, leaving Halsey alone with the children. After she left, Halsey went next door to smoke marijuana with Hall. As he left the apartment, he locked the doors and warned the children not to let anyone in. After Halsey and Hall smoked marijuana, they left the apartment building to go drinking at various bars. However, they separated when Hall went home prior to Halsey who stayed out and continued drinking. When Halsey finally arrived home at about 1 a.m., he observed that the door to his apartment was open, the lights and stove were on, and the children were missing. For reasons that are unclear to us, in his first account to the investigators of his

8

activities on the night of the murders he falsely claimed to have gotten into a fight on the way home. Regardless, discovering that the children were missing, Halsey began searching for them by asking several relatives and neighbors, including Hall, whether they had any information about the children's whereabouts. Halsey called Urquhart within a half hour of arriving home and told her that the children were missing. In a debilitated state—he described being "in a daze" after staying up until 4 a.m.—Halsey went to work that morning even though the children still were missing, but he returned home after Urquhart called him and told him that Tyrone was dead.

Following his initial interview with Halsey at the police station, Pfeiffer obtained and executed a search warrant to take Halsey's clothes and to obtain his fingernail scrapings. Pfeiffer then asked Halsey if he would take a polygraph examination, and Halsey agreed to do so. Lynch, who was in charge of the Major Crimes Division of the Union County Prosecutor's Office, arranged for a polygraph examiner from that office, Peter Brannon, to administer the polygraph. Meanwhile, Halsey fell asleep at the police station as he waited for the detectives and Brannon to arrive. When they arrived, Brannon interviewed Halsey and determined that he was too sleep deprived to take the test. After Halsey had spent over 12 hours at the police station, officers took him to his apartment to get clothes and then took him to his half-sister's apartment to sleep. They told him that they would pick him up the next morning to administer the polygraph test.

On the morning of Saturday, November 16, Pfeiffer picked up Halsey and drove him to the prosecutor's office in

Elizabeth, New Jersey. There, Halsey, who was not represented by counsel, signed a statement stipulating that the results of the polygraph test could be admitted into evidence at a criminal trial. The agreement went further and explicitly waived any opportunity for the side opposing the use of the polygraph results to introduce expert witnesses at trial to challenge the results, but did permit questions relating to the polygraph examiner's qualifications and methods.

Halsey ate breakfast and then took the polygraph, which, according to an uncontested expert report written years later by Charles Honts, Halsey's expert on polygraphs, he passed. This report, which Honts prepared with the use of methods of assessing polygraph results that had been upgraded since the time that Brannon gave the test, indicated that despite "some serious problems with the design and implementation" of the exam, Halsey registered "the strongest truthful score possible," even according to the metric used in 1985. J.A. 819-20. Honts further opined that "no polygraph examiner who used a valid scoring technique in 1985 could [have reached] the conclusion that Mr. Halsey was being deceptive." J.A. 819. Nevertheless, Lynch testified at Halsey's criminal trial that when he met with Brannon at the prosecutor's office, Brannon's "preliminary" view was that Halsey "was attempting deception." J.A. 410. In fact, Brannon subsequently indicated in a written report that Halsey had lied in some respects, he was likely the killer, and he had acted alone.

When Halsey finished taking the polygraph exam, Pfeiffer drove him to the police station in Plainfield, and again took him to an interview room. The evidence at Halsey's trial

indicated that Halsey had told Pfeiffer that he wanted to correct his first statement, though the record is unclear (and the parties do not explain) whether this was why the police took Halsey to the station or whether he went there on his own accord. In any event, Halsey gave a second statement, which, like the first, included many details, none of which were incriminating. He did, however, recite in the second statement that he had not gotten into a fight on his way home after drinking at the bars, as he had claimed in his first statement. But he added that he returned to his apartment with another individual, who, he said, could confirm part of his account. Halsey has not explained why he made up the seemingly insignificant fact regarding the imaginary fight, though in his deposition in this case he indicated that his physical state when he gave his first statement could have been a contributing factor leading to this fabrication.

Halsey testified in his deposition that he thought that up until this point Pfeiffer had treated him "fairly." D.A. 50. Indeed, Halsey indicated that Pfeiffer even offered him cigarettes. In Halsey's view, however, the nature of his treatment soon changed. While Halsey was completing his second statement, Pfeiffer and Lynch knew that Brannon believed that Halsey had failed his polygraph test. The detectives nonetheless let Halsey finish his story, to "hear him out," J.A. 414, before confronting him with the results of the polygraph.

After conferring with Lynch, Pfeiffer returned to interrogate Halsey for the next two hours, beginning at about 3:40 p.m.—an interrogation that Pfeiffer claimed in his deposition ultimately led Halsey to confess to the commission of

11

the crimes. Halsey claimed in his deposition that this time Pfeiffer took a different, more "forceful" approach than he had taken earlier. D.A. 55. Pfeiffer stopped taking notes and fixated on Halsey. As a result, the only record of this critical interrogation appears in Pfeiffer's summary of the interview, which he drafted four days later. Lynch, as well as Pfeiffer, prepared reports describing the proceedings in the investigation so that each set forth his view of the investigative steps.

According to Halsey's deposition testimony, Pfeiffer was as relentless in this renewed interrogation as he was obstinate:

> He didn't really want to hear what I had to say. He was just coming with these ideas, this paper, and he was telling me this and telling me that. . . . I'm telling him I had nothing to do with the crime, okay. This man keeps telling me I have something to do with the crime; this person said that, that person said that, I failed the polygraph test, and he kept going over and over and over. I told him I didn't do it, I don't know nothing about it.

D.A. 55. Pfeiffer probed Halsey's statements, which he told Halsey he found absurd, like not calling the police immediately after discovering that the children were missing and eating a meal before looking for them.

Pfeiffer also told Halsey that two witnesses, Jeffrey Nicholson and Halsey's cousin, Audrey King, had given statements contradicting his account of his activities on the night

12

of the murders. Pfeiffer informed Halsey that Nicholson said that he had heard Halsey engage in sexual relations that night at a time when Halsey claimed he was searching for the children, and that King had spoken with him about Tina and Tyrone prior to the time that he claimed to have returned home from his evening of drinking. In addition, Dawn Troutman said that Halsey called her at around 9:00 p.m. on the night of the murders and told her that the children were missing. In 2007, King and Troutman told the Union County Prosecutor's office that their statements to the police at the time of the original investigation had been inaccurate. According to these witnesses' 2007 accounts, the police at the time of the first investigation had "badgered" Troutman and coerced King until they agreed to change earlier statements that they had given.

Halsey contended in his deposition in this case that he maintained his innocence throughout the interrogation, telling Pfeiffer repeatedly that he "didn't do it" and that he "had nothing to do with it." J.A. 277-78. Pfeiffer purports to have a different recollection of the interrogation. In the report that he prepared after the prosecutor filed the charges against Halsey, he wrote that Halsey began "talking in somewhat jibberish type of phrases" and told Pfeiffer that he often loses control when he consumes drugs and alcohol, becoming a "Jeckyl and Hyde." It then became obvious to Pfeiffer that Halsey wanted "to get something off of his mind"; Pfeiffer said that he could help; and Halsey "went into some form of a trance . . . talking basically in one syllable sentences." Halsey began to cry, and then confessed in vague terms to killing the children and hiding their bodies. J.A. 485-86. Halsey acknowledged in his deposition to having cried, and could not recall whether he went into a trance;

13

but he denied the rest of Pfeiffer's account, particularly the portion about confessing.

According to Lynch's deposition testimony, Pfeiffer emerged from the interview room around 6:00 p.m., about 2.5 hours after he began the more forceful part of the interrogation, and told Lynch that Halsey had confessed to the crime. He also showed Lynch a piece of paper with Halsey's handwriting, which contained doodles and cryptic phrases—still nothing incriminating—including the line, "I feel like a fuck up because of thing or things that happen [sic] Friday night." J.A. 929.

According to Pfeiffer's report, Halsey requested that members of the Union County Prosecutor's Office join in his conversation with appellees. Lynch testified at Halsey's trial that he entered the interview room with Pfeiffer, beginning another six hours of uninterrupted interrogation. Appellees described Halsey asking Lynch what charges he would face and, upon learning that he would be charged with rape and homicide, he agreed to make a formal statement. Without any objection or request for clarification, Halsey again agreed to waive his Miranda rights.

Pfeiffer recorded the alleged confession in a question-and-narrative-answer format to which we refer as Halsey's third statement. The account began with Halsey, who was frustrated and angry, berating Urquhart before she departed to play bingo, and quickly turned into a scene of Halsey beating and choking the children. This account contained information about the crime that was not publicly available, and thus that only the police and the murderer knew. The account, in terrible detail,

14

indicates that a brick was used to hammer nails into Tyrone's head and was left on a closet shelf; bloody rags and scissors were stuffed in a plastic bag and hidden in a boiler room, outside of a broken window; Tina was raped on a couch in the basement, with her underwear stuffed in her mouth; and the children's bloodied bodies were carried down the staircase to the basement.[3]

The purported confession also included details that were consistent with what the investigators believed at the time they were questioning Halsey, but these details were inconsistent with or omitted significant facts as they ultimately emerged. Thus, Pfeiffer's summary of Halsey's confession stated that he had hammered four nails into Tyrone's head. It is true that four nails were visible when the police examined Tyrone's body, but an x-ray and a pathology report later revealed that there was a fifth nail in Tyrone's head. In another omission of a critical fact, the confession did not indicate that Tyrone had been sexually assaulted, a fact that was not known until later tests were performed on Tyrone's body.

While Halsey was insisting that he was innocent (or if Pfeiffer's and Lynch's testimony at Halsey's criminal trial is to

---

[3] In the statement attributed to Halsey he said that he carried the two children down the stairs to the basement and that he sexually assaulted Tina "in the basement on the blue couch." J.A. 488-89. He also purportedly said that he grabbed Tina by the throat "upstairs and choked her" until he "killed her." J.A. 490. This point is important as the police found "blood on the staircase" and that was a "nonpublic fact." J.A. 549.

15

be believed, while he was confessing), Assistant Prosecutor David Hancock was outside of the interview room, waiting for Pfeiffer or Lynch to slide each finished page of what appeared to be a summary of Halsey's oral confession underneath the door. Hancock was present to suggest any questions that the detectives might have forgotten to ask and to determine whether there was sufficient probable cause to charge Halsey with the murders. Hancock testified in his deposition that he did not recall hearing any yelling and even reported hearing laughter coming from the interview room. But Hancock was unable to understand the interview room's occupants' conversation and assumed that the pages appellees were sliding to him were an accurate transcription of Halsey's statement.

Although Halsey has denied confessing, he has admitted that after the investigators reduced the incriminating statement to writing and showed it to him, he signed it. Halsey explained in his deposition that the detectives had been ignoring his answers, and he was "tired . . . , drained, frustrated." D.A. 67. Halsey claimed in his deposition to have signed the statement to "get away" from the detectives, who had been "coming at [him]" all night, causing him to "fear[] for [his] life." D.A. 67; J.A. 276, 494.[4]

The chief of the Plainfield Police Department, John

_____

[4] Halsey testified in his deposition that "I just was arguing with them and going back and forth and no one seemed to be listening to what I was saying, and there was hollering and screaming and just so much stuff, and I was like, whatever, I just signed, [sic] get away from them." J.A. 276.

16

Propsner, arrived at the police station at about midnight to go over Halsey's third statement, the so-called confession. It took about 17 minutes for Propsner to discuss the written statement with Halsey and to obtain his signature on it. According to Pfeiffer's summary, Halsey made a minor edit on the first page, which shows a handwritten "I" and "BH." Halsey testified in his deposition that he could not recall whether he made those changes, or whether he even had a chance to review the statement before he signed it.

Hancock testified in his deposition that, based in part on Halsey's confession, he decided to charge Halsey with the murders. Halsey's apparent knowledge of the nonpublic details of the crimes significantly contributed to Hancock's decision to charge Halsey with the offenses. As Hancock explained in his deposition, he deems corroborating evidence to confessions to be critical and uncorroborated statements to be "worthless." J.A. 753. The incriminating details that he believed that Halsey supplied were particularly important because, in Hancock's view, a defendant's failure on a polygraph examination is not, in itself, a sufficient basis to arrest and charge him. Hancock did not indicate whether, without the confession, he would have believed that there was sufficient probable cause to prosecute Halsey based on the polygraph exam results and other evidence, such as the circumstance that Urquhart left him alone with the children when she left the apartment to play bingo and go to work. He conceded, however, that he would not have charged Halsey that night if he did not have the confession.

Hancock read only a few pages of what he believed was Halsey's admission of guilt before starting to draft the criminal

17

complaint against him. Hancock explained in his deposition that if Halsey had refused to sign the so-called confession and backtracked, he might not have charged Halsey with the offenses. But Halsey gave no indication to Propsner that the confession was, as he later put it, "a lie." D.A. 38. So Hancock saw no reason to delay bringing the charges.

A detective, other than Pfeiffer or Lynch, took Halsey to be arraigned on charges of first degree murder, aggravated sexual assault, possession of a weapon, and child abuse.[5] During a hearing in a state trial court on a motion to suppress evidence of the confession, the prosecutor indicated that if the court excluded Halsey's signed confession, the prosecution would not have sufficient evidence to proceed with the case because the confession was the sole direct evidence linking Halsey to the crimes as there was no physical evidence or eyewitness testimony supplying such a link. The state court denied the motion to suppress the confession, so it was admitted into evidence, and used at trial. Halsey was convicted and sentenced to two life terms plus 20 years in prison. As severe as the sentence was, it was less severe than the death penalty that the prosecutor had sought. Halsey appealed, but the New Jersey courts upheld the conviction. See State v. Halsey, 748 A.2d 634, 635 (N.J. Super. Ct. App. Div. 2000).

The criminal proceedings did not end with the trial and direct appeal. Finally, after additional proceedings, the Union

---

[5] Prosecutor Howard Weiner signed the criminal complaint, but he had no recollection of Halsey's criminal case when he was deposed in this litigation.

County Prosecutor's Office agreed to release certain items from the crime scene for DNA testing. In 2006 a DNA test and a follow-up investigation confirmed, beyond dispute, that Halsey was innocent. In particular, the results excluded Halsey as a potential contributor to the semen stains found on Tina's underpants and the basement couch. Those items, as well as a cigarette butt in the basement, tied Clifton Hall to the crimes. The Union County Prosecutor's Office then moved to vacate Halsey's conviction and it sought and obtained an order dismissing the indictment against Halsey who was released from prison.

The prosecutor then reopened the investigation and ultimately concluded that Hall had committed the offenses and had acted alone. Besides the new DNA evidence, the prosecution took into account a new witness account, which debunked a statement that Hall had given regarding his whereabouts the night of the murders, as well as an expert report suggesting that Halsey's behavior during his confession should have raised "red flags." [6] J.A. 1138-39, 1142. The investigators concluded that "there was no evidence linking Byron Halsey to that murder scene at all, at all." J.A. 1143. Hall was indicted for commission of the offenses, but died while in custody before he could be tried for the offenses involved in this case. Hall's attorney later represented to the prosecution that Hall had been

[6] An assistant prosecutor testifying in a deposition about the reinvestigation of the criminal case referred to a report authored by a Dr. Schlesinger, which none of the parties discusses in the briefs.

prepared to confess to having committed the offenses.

### III. PROCEDURAL BACKGROUND

Halsey's original complaint in this case, filed in March 2009, named a number of defendants besides Pfeiffer and Lynch, but ultimately the District Court dismissed the complaint against all the defendants, some with Halsey's consent or on his motion. These additional defendants were police officers and investigators, including Propsner and Brannon, as well as Union County, the City of Plainfield, and the Plainfield Police Department. Halsey has not appealed from any order dismissing a defendant other than appellees, and thus we are concerned only with the District Court's February 21, 2013 order granting appellees' motions for summary judgment. In the portion of the order from which Halsey appeals, the Court dismissed Halsey's claims of fabrication of evidence, malicious prosecution, and coercion under 42 U.S.C. § 1983 predicated on federal constitutional law as well as supplemental counts under N.J. Stat. Ann. §10:6-2, et seq.[7]

---

[7] Halsey included a section 1983 claim in his complaint based on the law announced in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963), contending that appellees suppressed exculpatory evidence relating to his case. Although Halsey opposed the dismissal of his Brady civil claim at the summary judgment proceedings, he does not seek a reversal of that dismissal on this appeal. Thus, we do not address that claim.

When the District Court granted Pfeiffer and Lynch summary judgment it said that they were entitled to qualified immunity from Halsey's action. First, the Court held that appellees had qualified immunity from Halsey's due process of law fabrication claim because this Court never expressly has recognized such a claim as the basis for a stand-alone cause of action, i.e., a claim not tied to a separate cause of action, and thus appellees could not have violated established law simply by fabricating evidence. Second, the Court granted appellees summary judgment on Halsey's Fourth Amendment malicious prosecution claim because it believed that Hancock, the prosecutor, made a reasonable and independent decision to charge Halsey, and by this intervening act created a defense for appellees on that claim. Finally, the Court found that Halsey's testimony undercut his claim that appellees coerced him into making a false confession in violation of due process of law. Halsey challenges these conclusions on appeal.[8]

IV.    JURISDICTION AND STANDARD OF REVIEW

---

[8] Although Pfeiffer and Lynch have filed separate briefs, they have taken virtually identical positions on this appeal and Lynch's brief incorporates much of its argument from Pfeiffer's brief. For simplicity, generally when we make reference to Pfeiffer's contentions we intend to include Lynch's contentions, or we refer to "appellees'" contentions. In this regard, we note that appellees are not at odds over the facts of the case.

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367; we have jurisdiction under 28 U.S.C. § 1291.[9] We exercise plenary review of the District Court's grant of summary judgment and the legal issues underpinning a claim of qualified immunity. Doe v. Luzerne Cnty., 660 F.3d 169, 174 (3d Cir. 2011); Yarris v. Cnty. of Delaware, 465 F.3d 129, 134 (3d Cir. 2006).

In reviewing orders entered on motions for summary judgment, we apply the same standard as a district court, and thus we determine whether there was any "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). When defendants move for summary judgment, they bear the burden "to show that the plaintiff has failed to establish" an essential element of his claim. Burton v. Teleflex Inc., 707 F.3d 417, 425 (3d Cir. 2013). At the summary judgment stage of proceedings, courts do not "weigh the evidence or make credibility determinations," but, instead, leave that task to the fact-finder at a later trial if the court denies summary judgment. Petruzzi's IGA Supermarkets v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir. 1993). In considering a summary judgment motion, a court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from the evidence. Burton, 707 F.3d at 425. The

---

[9] After Halsey filed his initial notice of appeal, the parties formalized an agreement that they had reached to dismiss the case against defendants other than appellees, and the District Court entered dismissal orders in accordance with that agreement, making its decision granting summary judgment to appellees a final and appealable order.

line between reasonable inferences and impermissible speculation is often "thin," Fragale & Sons Beverage Co. v. Dill, 760 F.2d 469, 474 (3d Cir. 1985), but nevertheless is critical because "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment." Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990). Inferences must flow directly from admissible evidence. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513 (1986).

## V.    DISCUSSION

As we noted, the District Court held that qualified immunity shielded Pfeiffer and Lynch from liability on all three claims that Halsey presses on this appeal. Qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982).

A qualified immunity inquiry is two-pronged, though courts are free to address the two elements in whichever order they deem appropriate. Pearson v. Callahan, 555 U.S. 223, 235, 129 S.Ct. 808, 818 (2009). Normally, however, in considering a qualified immunity issue, we will ask whether a defendant's conduct violated a defendant's statutory or constitutional rights before addressing whether that law had been established at the time of the violation so that the unlawfulness of the conduct

23

should have been apparent to an objectively reasonable official. See, e.g., Showers v. Spangler, 182 F.3d 165, 171 (3d Cir. 1999); see also Pearson, 555 U.S. at 236, 129 S.Ct. at 818 (recognizing that addressing the two elements in the traditional order is "often beneficial").[10]

Unlike some other courts,[11] we follow the general rule of

---

[10] Like the District Court, we acknowledge the preference for resolving qualified immunity questions "at the earliest possible stage in litigation," preferably before discovery. Pearson, 555 U.S. at 231, 129 S.Ct. at 815 (citation and internal quotation marks omitted). We recognize this preference because, as the Supreme Court has explained, "qualified immunity is an immunity from suit rather than a mere defense to liability . . . . [I]t is effectively lost if a case is erroneously permitted to go to trial." Id., 129 S.Ct. at 815 (internal citation and quotation marks omitted).

[11] See, e.g., Becker v. Bateman, 709 F.3d 1019, 1022 (10th Cir. 2013) ("This court reviews summary judgments based on qualified immunity differently than other summary judgments. When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff . . . ." (internal quotation marks omitted)); Crosby v. Monroe Cnty., 394 F.3d 1328, 1332 (11th Cir. 2004) ("Once the official has established that he was engaged in a discretionary function, the plaintiff bears the burden of demonstrating that the official is not entitled to qualified immunity."). We note, however, that our result on this appeal would not be different if we placed the burden on Halsey to demonstrate that appellees were not entitled to

24

placing the burden of persuasion at a summary judgment proceeding on the party asserting the affirmative defense of qualified immunity. See, e.g., Reedy v. Evanson, 615 F.3d 197, 223 (3d Cir. 2010) ("The burden of establishing entitlement to qualified immunity is on [the defendant-movant]."); Bailey v. Pataki, 708 F.3d 391, 404 (2d Cir. 2013) ("Qualified immunity is an affirmative defense and the burden is on the defendant-official to establish it on a motion for summary judgment."); see also Harlow, 457 U.S. at 812, 102 S.Ct. at 2735 ("The burden of justifying absolute immunity rests on the official asserting the claim." (emphasis added)). Thus, appellees either had to show that there was no genuine dispute of material fact to refute their contention that they did not violate Halsey's constitutional rights as he asserted them, or show that reasonable officers could not have known that their conduct constituted such a violation when they engaged in it.

A.      Fabrication of Evidence

The first claim on this appeal presents two purely legal questions: Did the appellees violate Halsey's constitutional right to due process of law under the Fourteenth Amendment by fabricating evidence to justify his prosecution? And, if so, was that Fourteenth Amendment right so clearly established by 1985, when appellees allegedly fabricated Halsey's oral confession, that reasonable officers would have known that their conduct in fabricating evidence would violate that right?

_____

qualified immunity.

25

Appellees argue that they cannot be held liable either for fabricating Halsey's confession, because it "only had relevance once signed," or for writing their reports describing the investigation, because they wrote those reports after the prosecutor already had filed the charges against Halsey. Pfeiffer's br. at 30. Those contentions besides being unpersuasive, come too late. They inform only the first prong of the qualified immunity inquiry—i.e., whether appellees committed a constitutional violation—but the appellees did not address that prong in the District Court. Before that Court they addressed only the second prong of a qualified immunity claim, i.e., whether reasonable officers would have known that their conduct violated a defendant's statutory or constitutional rights. Thus, the District Court did not consider whether appellees had a qualified immunity defense based on the first prong of that defense and appellees have not preserved any contention that they had a defense on that basis. See, e.g., United States v. Dupree, 617 F.3d 724, 727 (3d Cir. 2010) (confirming the "well-established proposition that arguments not raised in the district courts are waived on appeal").

But even if they had preserved their new contentions they would be meritless for two reasons. First, the contention that a defendant's oral confession is irrelevant until there is a signed written confession is simply wrong. Evidence of oral confessions can be admissible in criminal trials, particularly if the confessing defendant has waived his Miranda rights. See, e.g., United States v. Oba, 978 F.2d 1123, 1130 (9th Cir. 1992) ("Oba signed a waiver form and gave an oral statement. Thus, his confession was admissible."); see also 18 U.S.C. § 3501(e) (including both oral and written confessions as admissible in

federal criminal proceedings).

Second, for purposes of summary judgment, appellees engaged in conduct before Halsey signed the purported confession and before the prosecutor charged him with commission of the crimes that later injured him. Appellees allegedly inserted nonpublic facts about the crime (of which Halsey could not have been aware) into a detailed oral confession that Halsey maintains he never made. Their purported fabrication was double-edged: they told the prosecutor that Halsey had confessed even though he had not done so, and they included critical details in the confession to enhance its credibility in order to induce the prosecutor to proceed against Halsey. Accordingly, even if appellees' contention that oral confessions have no "relevance" were correct in the abstract, as already noted, Halsey's confession was quite relevant because it played a crucial role in the prosecutor's decision to charge him.[12]

---

[12] Lynch's counsel at oral argument contended that we should affirm the dismissal of the fabrication count against his client by arguing his client was not in the interview room at the time of the alleged fabrication. Lynch has waived this contention because he did not make it in the District Court and has raised it for the first time on this appeal. See United States v. Voigt, 89 F.3d 1050, 1064 n.4 (3d Cir. 1996). But even if Lynch preserved the contention, it would be meritless in these summary judgment proceedings. Although, according to Pfeiffer, Halsey initially confessed to him alone, Lynch entered the room when Halsey made the detailed—and purportedly fabricated—

27

We thus turn to the legal question of whether a state actor engages in actionable conduct simply by fabricating evidence. The District Court held that he does not do so because, in the Court's view, malicious prosecution claims that often accompany fabrication claims subsume the fabrication claims. The Court believed that this Court has not recognized that fabrication claims standing alone are actionable under 42 U.S.C. § 1983, and it therefore reasoned that appellees could not have violated established law in 1985 by fabricating evidence. We disagree. When falsified evidence is used as a basis to initiate the prosecution of a defendant, or is used to convict him, the defendant has been injured regardless of whether the totality of the evidence, excluding the fabricated evidence, would have given the state actor a probable cause defense in a malicious prosecution action that a defendant later brought against him. We thus pass to the question of whether a state actor can be liable on a stand-alone claim for fabrication of evidence or whether a defendant's fabrication claim must be included as an aspect of a malicious prosecution claim.

1. Whether There is an Independent Prohibition Against Fabricating Evidence

Appellees concede that a criminal defendant has been denied due process of law if he is convicted on the basis of fabricated evidence. Pfeiffer br. at 34 ("It is undisputed that

statement that was passed page-by-page (either by Lynch or Pfeiffer) to Hancock, the prosecutor. Thus, the record supports a conclusion that Lynch played a role nearly as central as that of Pfeiffer in the fabrication of the confession.

28

fabrication of evidence can violate the Constitution. . . ."). They further agree that a defendant can seek redress for violation of this right through a civil action under 42 U.S.C. § 1983, though they maintain that he can do so only by bringing the fabrication claim as part of a malicious prosecution claim. Thus, appellees contend that the two claims are intertwined and that the former can exist only as a portion of the latter.

The District Court agreed with this position in reliance on several district court opinions as well as our opinion in Johnson v. Knorr, 477 F.3d 75 (3d Cir. 2007). But Johnson does not stand for the proposition that the District Court ascribed to it, to wit that we have "recognize[ed] a fabrication of evidence claim as one for malicious prosecution." Halsey, 2013 WL 646200, at *8. In Johnson, the plaintiff-appellant, Gamal Johnson, fused his fabrication of evidence and malicious prosecution claims by arguing that the district court had erred in dismissing his malicious prosecution count that he based in part on allegations that evidence against him was fabricated. See Johnson, 477 F.3d at 81. But Johnson did not argue that a fabrication claim could give rise to a stand-alone cause of action, and, accordingly, we did not address that issue. We will do so today.

Section 1983 provides a civil remedy for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. To state a claim under section 1983, a plaintiff must demonstrate that "some person has deprived him of a federal right . . . [and] that the person who has deprived him of that right acted under color of state or territorial law." Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923 (1980). Appellees do not contend that

29

they were not acting under the color of state law when they questioned Halsey during their investigation of the murders and, as we have noted, they acknowledge that by fabricating evidence a state actor violates a criminal defendant's constitutional rights.

But the parties disagree over the identification of the constitutional right implicated in a fabrication case. This identification can be important. Appellees maintain that a state actor by fabricating evidence violates only the Fourth Amendment and its protection against unlawful seizures,[13] and the violation is redressable, as we have indicated that they have asserted, only by bringing a case for malicious prosecution.[14]

---

[13] The Fourth Amendment provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[14] For two reasons our discussion of malicious prosecution, as distinguished from our discussion of fabrication of evidence, will center on the Fourth Amendment rather than on the Fourteenth Amendment. First, while Halsey pled both Fourth and Fourteenth Amendment malicious prosecution counts, at some point in the proceeding—certainly by the time of the appeal—he abandoned the Fourteenth Amendment iteration of

the malicious prosecution claim, thus obviating the need for us to decide its viability. Compare Torres v. McLaughlin, 163 F.3d 169, 173 (3d Cir. 1998) (reaffirming that section 1983 malicious prosecution claims cannot be based on substantive due process but declining to decide whether they could be grounded in procedural due process), with Gallo v. City of Philadelphia, 161 F.3d 217, 222 (3d Cir. 1998) (suggesting that Supreme Court case law leaves only the Fourth Amendment as potential source of malicious prosecution claims). In addition, neither Halsey nor appellees point to other constitutional provisions covering malicious prosecutions. See, e.g., Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 792-93 (3d Cir. 2000) (analyzing malicious prosecution claims predicated on the First and Sixth Amendments).

Second, though appellees mention in passing and in general terms other causes of action that potentially could subsume evidence-fabrication claims—namely, false arrests (Pfeiffer's br. at 32; Lynch's br. at 20) and claims pursuant to Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963) (Pfeiffer's br. at 34)—for purposes of this case, they focus exclusively on the Fourth Amendment malicious prosecution theory. Furthermore, the Fourth Amendment is the only constitutional predicate that the District Court found covered Halsey's evidence-fabrication count. Halsey, 2013 WL 646200, at *8-9. In these circumstances, we, too, will focus on the Fourth Amendment when discussing malicious prosecutions claims. We add, however, that even if a fabrication claim could be tied to a claim under a constitutional provision other than the Fourth Amendment, we would see no reason why the fabrication

31

Pfeiffer's br. at 30-31. See Johnson, 477 F.3d at 81-82. Halsey, however, grounds the right to be free from fabricated evidence on the Fourteenth Amendment's guarantee of due process of law.[15] Appellant's br. at 25-26.

The boundary between Fourth Amendment and Fourteenth Amendment claims is, at its core, temporal. The Fourth Amendment forbids a state from detaining an individual unless the state actor reasonably believes that the individual has committed a crime—that is, the Fourth Amendment forbids a detention without probable cause. See, generally, Bailey v. United States, __ U.S. __, 133 S.Ct. 1031, 1037 (2013). But this protection against unlawful seizures extends only until trial. See Schneyder v. Smith, 653 F.3d 313, 321 (3d Cir. 2011) (observing that post-conviction incarceration does not implicate the Fourth Amendment). The guarantee of due process of law, by contrast, is not so limited as it protects defendants during an entire criminal proceeding through and after trial. Pierce v. Gilchrist, 359 F.3d 1279, 1285-86 (10th Cir. 2004) ("The initial

claim could not stand alone.

[15] The Fourteenth Amendment guarantees, in relevant part:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law . . . .

seizure is governed by the Fourth Amendment, but at some point after arrest, and certainly by the time of trial, constitutional analysis shifts to the Due Process Clause." (internal citation omitted)).

In the future we may be called on to chisel more finely the lines between the two claims—thus we might be required to decide precisely when an unlawful seizure "ends and [a] due process . . . [violation] begins." Pierce, 359 F.3d at 1286. But we are spared the burden of doing so now because the fabricated confession obviously injured Halsey long after he suffered an injury attributable to his pre-trial detention. In his complaint, Halsey alleged that the fabrication of evidence resulted in an unfair trial and his wrongful conviction that, in turn, led to his incarceration. He supported these allegations opposing the summary judgment motions with evidence that the confession was fabricated, that it was the key ingredient to securing his indictment and conviction, and that it was the reason he spent 22 years in prison, almost 20 of which he served after his wrongful conviction. Wherever the boundary between the Fourth and Fourteenth Amendment claims lies, it is in the rear view mirror by the end of trial, when Fourth Amendment rights no longer are implicated. See, e.g., Schneyder, 653 F.3d at 321; Donahue v. Gavin, 280 F.3d 371, 382 (3d Cir. 2002) (disallowing recovery for post-conviction injuries based on the Fourth Amendment); Torres v. McLaughlin, 163 F.3d 169, 174 (3d Cir. 1998) ("At most, there may be some circumstances during pre-trial detention that implicate Fourth Amendment rights; however, we refer to the Fourth Amendment as applying to those actions which occur between arrest and pre-trial detention.").

Accordingly, at least some of Halsey's allegations stemming from the alleged oral confession do not fall under the traditional definition of a Fourth Amendment malicious prosecution claim. See Johnson, 477 F.3d at 81-82.[16] We therefore must decide whether his fabrication claim can be grounded on the due process clause of the Fourteenth Amendment.

On this score, appellees have little to offer. To the best of our knowledge, every court of appeals that has considered the question of whether a state actor has violated the defendant's right to due process of law by fabricating evidence to charge or convict the defendant has answered the question in the affirmative. See Whitlock v. Brueggemann, 682 F.3d 567, 585 (7th Cir. 2012) (collecting court of appeals cases).[17] We join

---

[16] See also Albright v. Oliver, 510 U.S. 266, 271 n.4, 114 S.Ct. 807, 811 n.4 (1994) (collecting courts of appeals' cases dealing with treatment of malicious prosecution claims under section 1983); Washington v. Cnty. of Rockland, 373 F.3d 310, 316 (2d Cir. 2004) ("[T]o sustain a § 1983 malicious prosecution claim, there must be a seizure or other perversion of proper legal procedures implicating the claimant's personal liberty and privacy interests under the Fourth Amendment." (internal quotation marks omitted)).

[17] See also Washington v. Wilmore, 407 F.3d 274, 283 (4th Cir. 2005) (holding that a conviction and incarceration resulting from fabricated evidence may violate due process); Limone v. Condon, 372 F.3d 39, 45 (1st Cir. 2004) (observing that actions involving fabricating evidence and framing individuals

these courts in expressly adopting this principle.

A different view is not just unsupported; it is untenable. Adoption of the District Court's conclusion would mean that there would not be a redressable constitutional violation when a state actor used fabricated evidence in a criminal proceeding if the plaintiff suing the actor could not prove the elements of a malicious prosecution case, such as the lack of  probable cause for the prosecution.  See Johnson, 477 F.3d at 82.  We need not look beyond this case for a basis to reject appellees' contention that evidence-fabrication claims must be tied to malicious prosecution cases.  The District Court concluded that there was

"necessarily violate due process"); Wilson v. Lawrence Cnty., 260 F.3d 946, 954 (8th Cir. 2001) ("If officers use false evidence, including false testimony, to secure a conviction, the defendant's due process is violated."); Devereaux v. Abbey, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc) ("[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government."); Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997) ("Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable . . .[violation of due process.]"); United States v. Lochmondy, 890 F.2d 817, 822 (6th Cir. 1989) ("The knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.").

35

probable cause to charge Halsey even without considering his confession.[18] Even if we agreed with this conclusion (and we do not), we believe that no sensible concept of ordered liberty is consistent with law enforcement cooking up its own evidence.

We emphatically reject the notion that due process of law permits the police to frame suspects. Indeed, we think it self-evident that "a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.'" Id. (quoting, inter alia, United States v. Agurs, 427 U.S. 97, 104, 96 S.Ct. 2392, 2397 (1976)). Requiring that a plaintiff join a fabrication claim with a malicious prosecution claim would come close to making "a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice." Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997).

We could not reconcile a contrary conclusion with the mandate of section 1983 that guarantees defendants (and other persons as well) against "deprivation of any rights . . . secured by the Constitution." 42 U.S.C. § 1983 (emphasis added). As the Supreme Court has explained, section 1983 was intended "to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161, 112 S.Ct. 1827, 1830 (1992). A rule of

---

[18] The District Court, referring to the fabricated confession, said that "there were facts independent of the tainted evidence . . . to establish probable cause." Halsey, 2013 WL 646200, at *6.

36

law foreclosing civil recovery against police officers who fabricate evidence, so long as they have other proof justifying the institution of the criminal proceedings against a defendant, would not follow the statute's command or serve its purpose.

Against these settled principles and overwhelming precedent, appellees cite district court decisions that fall into two categories, but both categories are distinguishable from this case. Pfeiffer's br. at 30-32. In the first group, the cases merely demonstrate that a single set of factual allegations can contribute to more than one claim. For instance, one case that Pfeiffer cites, Pfeiffer's br. at 31, explained that falsification of evidence, like other "bad-faith conduct," can be "probative of a lack of probable cause." Peterson v. Bernardi, 719 F. Supp. 2d 419, 428 (D.N.J. 2010). But that view is reconcilable with a conclusion that there is an independent falsification claim for "[c]ertain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands." Soldal v. Cook Cnty., 506 U.S. 56, 70, 111 S.Ct. 538, 548 (1992); see also Gregory v. City of Louisville, 444 F.3d 723, 750-54 (6th Cir. 2006) (reversing district court's conclusion that one factual premise could not form the bases of separate claims of constitutional violations under section 1983).

The second group of cases that appellees cite involve plaintiffs against whom the germane criminal charges were dismissed before trial. See, e.g., Molina v. City of Lancaster, 159 F. Supp. 2d 813 (E.D. Pa. 2001). These decisions are inapposite here because, as we noted earlier, we do not decide today whether pre-trial detentions can implicate constitutional rights beyond the Fourth Amendment inasmuch as we are

37

dealing with injuries that go far beyond the injury to Halsey attributable to his pre-trial detention.

To be sure, some courts have expressed uncertainty as to whether section 1983 evidence-fabrication claims can stand alone, and Zahrey v. City of N.Y., No. 98-4546, 2009 WL 54495, at *36 n.47 (S.D.N.Y. Jan. 7, 2009), helpfully collects some of those cases. Zahrey points out that "[t]here seems to be some question in [the Second Circuit] as to whether evidence fabrication creates a section 1983 cause of action separate and apart from a malicious prosecution action." But at least some of the courts that treat fabrication and malicious prosecution claims together, as the Court of Appeals for the Second Circuit appeared to have done in Jocks v. Tavernier, 316 F.3d 128 (2d Cir. 2003), have done so in circumstances that we already have distinguished, namely where the evidence-falsification did not result in a conviction or where a plaintiff did not clearly advance a claim predicated on fabrication alone. In any event, we reject the contention that there cannot be a stand-alone Fourteenth Amendment claim predicated on the fabrication of evidence.

We find much support for our conclusion. For example, the Court of Appeals for the Fifth Circuit has found jury instructions "deeply flawed" when they limited the jury's use of fabricated evidence to evaluate a Fourth Amendment malicious prosecution claim without allowing a finding of a Fourteenth Amendment due process violation. Castellano v. Fragozo, 352 F.3d 939, 955 (5th Cir. 2003) (en banc). See also Lowery v. Cnty. of Riley, 522 F.3d 1086, 1093 (10th Cir. 2008) (affirming district court's denial of qualified immunity for claims of fabrication of evidence and malicious prosecution); Riley v. City

38

of Montgomery, 104 F.3d 1247, 1253-54 (11th Cir. 1997) (permitting a fabrication-of-evidence claim to go forward against one defendant while rejecting malicious prosecution claim against others); Stemler v. City of Florence, 126 F.3d 856, 872 (6th Cir. 1997) (holding that knowing use of fabricated evidence violates a criminal defendant's right to due process and is actionable "if there is a reasonable likelihood that the false evidence could have affected the judgment of the jury"). As these cases show, we are not the first court to reach our conclusion.

Accordingly, we hold that if a defendant has been convicted at a trial at which the prosecution has used fabricated evidence, the defendant has a stand-alone claim under section 1983 based on the Fourteenth Amendment if there is a reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted.[19] Appellees do not

---

[19] We use "reasonable likelihood" to emphasize that plaintiffs bringing fabrication claims must draw a meaningful connection between their conviction and the use of fabricated evidence against them. See 42 U.S.C. § 1983 (imposing liability on any official who violates or "causes to" violate a person's constitutional right). As the Court of Appeals for the Seventh Circuit recently explained, this causal link is a familiar concept in tort law, requiring both factual and proximate causation. Whitlock, 682 F.3d at 582-83; see also Gregory, 444 F.3d at 737 ("It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." (Emphasis added.) The

argue that the false confession attributed to Halsey, which the prosecutor acknowledged in the state courts was the only direct evidence linking Halsey to the crimes, could not have affected the jury's verdict. As a result, we have no difficulty in concluding that Halsey has demonstrated that there is a genuine dispute of material fact on the question of whether appellees violated his right to due process of law by fabricating evidence against him. Thus, the District Court erred when it granted summary judgment to appellees on the fabrication claim.

In reaching our result, we hasten to add that courts in this Circuit should not permit a criminal defendant who later brings a civil action against state actors who had been involved in his

---

requirement is in line with our own precedent, though until today we have not had occasion to apply it in the fabrication context. See, e.g., Lamont v. New Jersey, 637 F.3d 177, 185 (3d Cir. 2011) ("Like a tort plaintiff, a § 1983 plaintiff must establish both causation in fact and proximate causation."). Because the record at summary judgment established that Halsey's fabricated confession was critical to his conviction, we do not decide whether the mere introduction of falsified evidence at trial—without regard to its significance in the context of other evidence considered by the jury—is necessarily sufficient to satisfy the causal link. Nor do we decide whether a defendant acquitted at a trial where fabricated evidence has been used against him has an actionable section 1983 claim. We note, however, that if fabricated evidence is used as a basis for a criminal charge that would not have been filed without its use the defendant certainly has suffered an injury.

40

prosecution to use this opinion beyond the scope of our holding. Thus, a civil plaintiff alleging that he had been convicted in a criminal prosecution in which the prosecutor used fabricated evidence should not be permitted to survive a motion for summary judgment or for judgment as a matter of law unless he can demonstrate that the record supports a conclusion that the allegedly fabricated evidence was so significant that it could have affected the outcome of the criminal case.[20] Moreover, testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong. Therefore, for example, a witness's misidentification should not be regarded as a fabrication in the absence of persuasive evidence supporting a conclusion that the proponents of the evidence were aware that the identification was incorrect, and thus, in effect, offered the evidence in bad faith. Accordingly, we expect that it will be an unusual case in which a police officer cannot obtain a summary judgment in a civil action charging him with having fabricated evidence used in an earlier criminal case. But we deal here with such a case. See Whitlock v. Brueggemann, 682 F.3d 567, 586 (7th Cir. 2012).

2. Whether the Law Was Clearly Established in 1985

---

[20] We, of course, are not suggesting that there is nothing wrong with the fabricating of evidence if it does not affect the final verdict. We do not have occasion to consider what legal mechanisms may be available to discipline police officers who corruptly try to change the outcome of a case but fail either because the jury returns a not guilty verdict or because the jury would have returned a guilty verdict even without the fabricated evidence.

41

Our foregoing conclusion recognizing the existence of a stand-alone section 1983 Fourteenth Amendment claim predicated on the use of fabricated evidence does not end our inquiry into whether the District Court erred in dismissing Halsey's fabrication count. Appellees also argue that because, back in 1985, we had not explicitly recognized Fourteenth Amendment stand-alone claims based on the fabrication of evidence, they are entitled to a qualified immunity defense on the fabrication of evidence claim as "it would not [have been] known to an officer what the elements of such a claim are or how it would be applied and analyzed by a court." Pfeiffer br. at 35. We disagree.

The established-right prong of a qualified immunity defense does not demand that there had been a precise preview of the applicable legal analysis underlying the defense; rather, "what is required is that government officials have 'fair and clear warning' that their conduct is unlawful." Devereaux, 263 F.3d at 1075 (quoting United States v. Lanier, 520 U.S. 259, 271, 117 S.Ct. 1219, 1227 (1997)).

Analogous precedent should have informed appellees or any reasonable state actor that, by fabricating evidence for use in a criminal prosecution, a state actor would violate a defendant's constitutional rights regardless of whether or not the state actor violated other constitutional rights of the defendant. The Supreme Court established decades before the original investigation in this case that the Constitution forbids prosecutors from knowingly using perjured testimony to secure a criminal conviction. See id. (citing Pyle v. Kansas, 317 U.S. 213, 216, 63 S.Ct. 177 (1942)); see also Miller v. Pate, 386 U.S.

42

1, 7, 87 S.Ct. 785, 788 (1967) ("More than 30 years ago this Court held that the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence."). Investigators, including appellees, should have known long before Halsey's prosecution that they would be violating a defendant's constitutional rights if they knowingly used fabricated evidence to bring about his prosecution or to help secure his conviction, particularly if the investigators themselves had fabricated the evidence. Cf. Devereaux, 263 F.3d at 1075 ("[T]he wrongfulness of charging someone on the basis of deliberately fabricated evidence is sufficiently obvious, and Pyle is sufficiently analogous, that the right to be free from such charges is a constitutional right."). Indeed, it has been an axiomatic principle of our justice system that "those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit." Limone v. Condon, 372 F.3d 39, 45 (1st Cir. 2004). As the Court of Appeals for the First Circuit said in Limone, "we are unsure what due process entails if not protection against deliberate framing under color of official sanction." Id.

The obviousness of this violation would be difficult to escape even without the closely analogous Supreme Court precedent discussed above. By the time appellees allegedly fabricated Halsey's confession, more than two decades had passed since the Supreme Court had held that the due process clause required that the prosecution reveal exculpatory evidence to a criminal defendant. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963). Reasonable officers should have known that if they could not withhold exculpatory evidence from a

43

defendant, they certainly could not fabricate inculpatory evidence against a suspect or defendant.

For these reasons, we will reverse the District Court's entry of summary judgment dismissing Halsey's fabricated-evidence claim.

B.      Malicious Prosecution

The District Court also entered summary judgment on Halsey's Fourth Amendment malicious prosecution claim. It reasoned that the prosecutor, Hancock, "used independent judgment in deciding to prosecute" Halsey because, when Hancock made his decision, "he was unaware of the alleged oral confession given to Pfeiffer earlier that day." Halsey, 2013 WL 646200, at *5. In addition, the Court concluded that even without his confession there was probable cause to prosecute Halsey. The Court also noted that even if there had not been probable cause for the prosecution, "the fault lies with Hancock" alone because he made his decision to proceed before Halsey signed his confession, which, in the Court's view, cleared appellees of any wrongdoing that justified the malicious prosecution action against them. Id. at *7. We disagree with each of these conclusions.

To prevail on a Fourth Amendment malicious prosecution claim under section 1983, a plaintiff must establish that:

> (1) the defendant initiated a criminal proceeding;
> (2) the criminal proceeding ended in [the

44

plaintiff's] favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

Johnson, 477 F.3d at 82; see also Rose v. Bartle, 871 F.2d 331, 349 (3d Cir. 1989).

As the District Court noted, appellees have conceded for purposes of the motions for summary judgment that most of these elements of a malicious prosecution case are present in this case and, in any event, even without that concession it is apparent that they are present. Consequently, we limit our review to the two questions in dispute: (1) whether Hancock engaged in intervening acts that severed the causal nexus tying appellees to the initiation of the prosecution; and (2) whether there would have been probable cause to charge Halsey absent his confession. If Hancock's actions did not absolve appellees of potential liability and the evidence was insufficient to establish conclusively that appellees had probable cause to bring charges against Halsey, once the fabricated confession was excluded, the District Court should not have granted appellees' motions for summary judgment against Halsey on his malicious prosecution claim.[21]

---

[21] We reiterate that our repeated reference to the confession as fabricated is only for purposes of our review of the disposition

45

### 1.  Causation

It is settled law that "officers who conceal and misrepresent material facts to the district attorney are not insulated from a § 1983 claim for malicious prosecution simply because the prosecutor, grand jury, trial court, and appellate court all act independently to facilitate erroneous convictions." Pierce, 359 F.3d at 1292; see also Ricciuti, 124 F.3d at 130; Jones v. City of Chicago, 856 F.2d 985, 994 (7th Cir. 1988). If the officers influenced or participated in the decision to institute criminal proceedings, they can be liable for malicious prosecution. Sykes v. Anderson, 625 F.3d 294, 308-09, 317 (6th Cir. 2010).[22]  The District Court recognized this precedent but

of the summary judgment motions.

[22] We need not decide how strong the connection must be between a police officer's misconduct and the defendant's eventual prosecution for the officer to be liable in a malicious prosecution action. Compare Robinson v. Maruffi, 895 F.2d 649, 656 (10th Cir. 1990) (requiring police officers to have been "instrumental" in the confinement and prosecution of the plaintiff (quoting Jones, 858 F.2d at 994)), and Peterson v. Bernardi, 719 F. Supp. 2d 419, 431 n.12 (D.N.J. 2010) ("[T]here must be a showing that the misconduct significantly contributed to the decision to prosecute."), with Sykes, 625 F.3d at 317 (requiring only that officers "influence[d]" the decision to prosecute), and Ricciuti, 124 F.3d at 130 (requiring officers to have "played a role" in the initiation of the prosecution).  As we

46

found it inapplicable because, in its view, the uncontroverted evidence established that Hancock reached his decision to prosecute Halsey without regard for the effect of appellees' alleged misconduct.

The record, however, does not justify the District Court's conclusion, for there were disputed factual issues barring a granting of summary judgment. See, e.g., Robinson v. Maruffi, 895 F.2d 649, 655-56 (10th Cir. 1990) (finding sufficient evidence to require that the jury decide whether prosecutor and courts were intervening actors that broke causal link between falsified statements produced by police officers and plaintiff's conviction). Hancock testified at the criminal trial (and later reaffirmed in his deposition in this case) that on November 16 he began drafting the criminal complaint at around 11:00 p.m., about five hours after Pfeiffer first told Lynch that Halsey had confessed, and about an hour and a half before Halsey signed the incriminating third statement. Standing alone timing would suggest that Hancock knew that Halsey had confessed when he started drafting the complaint, inasmuch as it would be reasonable to draw an inference that appellees would have advised Hancock, as the prosecuting attorney, of the confession. After all, they surely must have regarded their obtaining of the

explain below, the evidence viewed in the light most favorable to Halsey supports the conclusion that Hancock charged Halsey precisely because he believed that Halsey had confessed. Consequently, we conclude that, at this stage of the proceedings, on the basis of the record now before us, that appellees' misconduct was a significant cause of the prosecution.

confession as a major, indeed pivotal development in the case, as it undoubtedly was.

We recognize that at the trial that will follow the remand that we are requiring, appellees might argue that Hancock's action (drafting the complaint) lagged behind his thought process (his decision to charge Halsey) so that the confession did not contribute to his decision to file the complaint. But, without evidence to support this theory at this stage of the proceedings, we cannot affirm the District Court's order granting the motions for summary judgment on a delay-in-drafting theory for if we did so we would be grounding our determination on pure speculation.

In fact, when we view the events surrounding the initiation of the criminal proceedings against Halsey from Hancock's perspective, it is clear that the District Court erred in granting summary judgment on the theory that Hancock was an independent actor whose conduct severed the causal link between appellees' misconduct and the filing of the charges. As Hancock described the scene during the time when Halsey allegedly was confessing, he sat outside of the interrogation room, unable to hear what was being said inside, relying exclusively on each page of Halsey's alleged confession as appellees slid it to him. At the time, Hancock believed that those pages represented an accurate account of what Halsey was telling appellees—that the pages, in fact, contained virtually verbatim quotes from Halsey.

At some point Hancock believed that the evidence justified the initiation of criminal proceedings against Halsey.

48

He testified that he decided to bring those charges after reviewing at least a few pages of the statement that appellees had drafted, though he could not recall how many pages he had read by 11:00 p.m., when he began drafting the criminal complaint.[23] Hancock indicated in his deposition that if he had not believed that Halsey had made an oral confession, he would not have charged him "that night probably," a decision that was consistent with his normal practice of waiting to see a confession when he knows one is forthcoming. J.A. 793, 799. Hancock also testified that evidence was not uncovered later that would have convinced him to prosecute Halsey.

Moreover, the contents of Halsey's purported confession encouraged Hancock to initiate Halsey's prosecution. Hancock testified in his deposition that Halsey's knowledge of the nonpublic facts about the crime—facts that a rational jury now could conclude appellees inserted into the confession—influenced his decision to charge Halsey because those details corroborated the confession. In fact, Hancock testified that he

---

[23] This testimony also undercuts Lynch's suggestion that he had a qualified immunity defense to Halsey's malicious prosecution and coercion claims on the theory that he had not been present prior to Halsey's oral confession to Pfeiffer. Lynch's br. at 3-5, 12-13. Halsey has maintained that he never orally confessed, and that he admitted to the crime only when he signed his third statement. Thus, at this stage of the proceedings, we regard Lynch as having been in the room during the most critical time of the interrogation for purposes of all three claims—when he could have coerced Halsey, fabricated a confession, and contributed to the initiation of the prosecution.

49

"wouldn't authorize a complaint against someone if they confessed to something that could not be corroborated by other evidence. An uncorroborated statement by a defendant, in my estimation, is worthless." J.A. 752-53.

One reasonable—and compelling—view of all of this evidence is just the opposite of the one the District Court reached: Hancock charged Halsey precisely because he thought Halsey had confessed. Hancock's testimony shows that appellees' fabrication potentially influenced his decision in two ways: first, by appellees' summary of Halsey's purported oral confession, and second by their inclusion of nonpublic facts in the confession—facts known only to the murderer or, even more significantly, to the police. The record does not support the District Court's conclusion that Hancock was "unaware of [Halsey's] alleged oral confession." Halsey, 2013 WL 646200, at *5. Moreover, the Court on the summary judgment motions unjustifiably held that Hancock "used independent judgment in deciding to prosecute [Halsey]," id., a conclusion that it should not have reached as the evidence reasonably could have supported a finding that Hancock's judgment was very much influenced by the detailed confession, which at this stage of these proceedings, we must treat as fabricated.

Our holding also requires us to reject the District Court's separate conclusion that, even if Hancock lacked probable cause for initiation of the case against Halsey, Hancock alone should be liable for malicious prosecution. As we have observed, on the record before us, a rational jury could decide that appellees tainted the probable-cause inquiry: the officers allegedly handed Hancock a critical piece of fabricated evidence (the confession)

50

that, when combined with other information known to Hancock well might have been enough to lead him to file the criminal complaint. Halsey's malicious prosecution case against appellees therefore should have survived a causation inquiry on the motions for summary judgment. Consequently, we next will address the question of whether, in the absence of the confession, there would have been probable cause to proceed against Halsey.

## 2. Probable Cause

We are convinced that the District Court improperly resolved factual disputes and weighed the evidence to reach its conclusion that there would have been probable cause to charge Halsey even without his confession. "While 'the probable-cause standard is incapable of precise definition or quantification,' all interpretations of probable cause require a belief of guilt that is reasonable, as opposed to certain." Wright v. City of Philadelphia, 409 F.3d 595, 602 (3d Cir. 2005) (internal citations omitted) (quoting Maryland v. Pringle, 540 U.S. 366, 371, 124 S.Ct. 795, 800 (2003)). "[T]he evidentiary standard for probable cause is significantly lower than the standard which is required for conviction." Id. at 602. It is therefore irrelevant in a probable cause inquiry "whether a person is later acquitted of the crime for which she or he was arrested." Id.

Unlike the causation question, a probable cause inquiry is entirely objective. [24] See, e.g., Kulwicki v. Dawson, 969 F.2d

---

[24] The District Court appeared to engage in a subjective analysis by focusing not just on Hancock's perspective, but also on his

51

1454, 1468 (3d Cir. 1992). Thus, Hancock's view of the evidence is relevant only to the extent it explains what facts were available to him when he made his discretionary decision to initiate the proceedings against Halsey. See Devenpeck v. Alford, 543 U.S. 146, 153, 125 S.Ct. 588, 593 (2004) ("[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."); see also Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S.Ct. 663, 668 (1978) (explaining that, so long as there is probable cause, a decision to charge or prosecute "rests entirely in [the prosecutor's] discretion").

Courts should exercise caution before granting a defendant summary judgment in a malicious prosecution case when there is a question of whether there was probable cause for the initiation of the criminal proceeding because, "[g]enerally, the existence of probable cause is a factual issue." Groman v. Twp. of Manalapan, 47 F.3d 628, 635 (3d Cir. 1995). It certainly is inappropriate for a court to grant a defendant officer's motion for summary judgment in a malicious prosecution case if there are underlying factual disputes bearing on the issue or if "reasonable minds could differ" on whether he had probable cause for the institution of the criminal

judgment. Thus, the Court indicated that "Plaintiff's signature and adoption of the Third Statement only served to reinforce Assistant Prosecutor Hancock's decision to prosecute Plaintiff, as Hancock believed that the signatures represented that Plaintiff was adopting the Third Statement voluntarily and that they were Plaintiff's words." Halsey, 2013 WL 646200, at *6.

52

proceedings based on the information available to him.  Deary v. Three Un-Named Police Officers, 746 F.2d 185, 192 (3d Cir. 1984).  Here, by entering summary judgment on the malicious prosecution claim, the District Court, effectively, if not explicitly, held that a reasonable jury could not conclude that the appellees lacked probable cause to charge Halsey even without the confession.  We disagree with that conclusion.

The District Court pointed to several pieces of evidence (apart from the confession) available to Hancock when he decided to charge Halsey: (1) "the results of the autopsy"; (2) "Hancock's review of the crime scene"; (3) "inconsistencies between [Halsey's] first and second statements"; (4) "the fact that the children were left in [Halsey's] care"; and (5) Halsey's failure of the polygraph exam.  Halsey, 2013 WL 646200, at *6.

In analyzing the evidence, we begin with the polygraph results because we agree with the District Court that they counseled in favor of finding that there was probable cause to institute the proceedings against Halsey, and the use of the polygraph results is a central matter in this case.  We, of course, are aware that Halsey points to Honts's unchallenged expert opinion prepared years after the murders that concluded that Halsey registered "the strongest truthful score possible" on the relevant scale, J.A. 820, a result so unequivocal that, according to the report, a reasonable polygrapher, even using 1985 standards, could not have concluded that Halsey had failed the test.  But, notwithstanding Honts's opinion, one polygrapher, Peter Brannon, did conclude immediately after the murders that Halsey failed the test.  Halsey argues that given the uncontroverted current evidence about the results of the test, as

53

we now know them, and the fact that Brannon discussed the polygraph results with appellees, a jury should be free to infer that "Pfeiffer and Lynch were aware that Halsey had passed the polygraph." Appellant's br. at 40. Obviously, if they had that knowledge during their investigation of the crimes, the polygraph results could not have supported a conclusion that they had probable cause to initiate the prosecution.

But Halsey, in contending that a jury could conclude that the appellees knew that he passed the polygraph examination, is asking us to permit a jury to engage in pure speculation. After all, inasmuch as Brannon's November 16, 1985 report stated that it was "the opinion of the Polygraph Examiner, based on the Polygraph Recordings, that the subject exhibited evidence of attempts at deception," it is unreasonable to believe on the present record that appellees thought that Halsey passed the test.[25] D.A. 93-94. In this regard, we point out that we see nothing in the record that suggests that appellees did not believe that Brannon's conclusions were accurate. Accordingly, a reasonable prosecutor in the position of appellees would have believed Halsey failed the polygraph exam and would have considered that those results supported a conclusion that there was probable cause for the prosecution. See Cervantes v. Jones, 188 F.3d 805, 813 n.9 (7th Cir. 1999) (collecting cases) ("[P]olygraph results are one of many factors which may be used in determining whether, from an objective viewpoint, probable cause for an arrest existed under the Fourth

---

[25] Again we are making no comment on what the record developed later may reveal to a jury.

54

Amendment.").

In reviewing the disposition of this action against appellees, as distinguished from how we would view a malicious prosecution case against Hancock,[26] we set the confession aside when considering the probable cause issue, because, for purposes of this case, we find that the confession was invalid inasmuch as appellees fabricated it. In the absence of the confession, the evidence supporting the case against Halsey was thin. Aside from the polygraph results, the District Court pointed to evidence of the crime scene and the results of the autopsy to support the filing of the charges against Halsey, but neither tied Halsey to the crimes. Halsey did alter some of the details of his account of his activities during the night of the murders when he gave his second statement, but he volunteered those changes, which, in any event, were minor and non-incriminating. Moreover, as Hancock seemed to recognize, the inconsistencies could have been due to Halsey's consumption of alcoholic beverages on the night of the murders.[27] Thus, at his deposition Hancock testified that "[p]art of the issue dealt with how much [Halsey] had to drink that night and whether he might

---

[26] We do not see why Hancock would not have been able to rely on the confession in contending that he had probable cause to initiate the prosecution because as far as the record shows he was not involved in or aware of the fabrication of the confession.

[27] We also note that Halsey had used marijuana before he went to the bars on the night of the murders and this use also could have contributed to his confusion.

55

have been intoxicated and not have the ability to recall certain events." J.A. 797.  Finally, though Halsey had the opportunity to commit the crimes because the children had been left in his care, a defendant's mere presence at a crime scene is not a basis for his arrest.  See Harris v. Bornhorst, 513 F.3d 503, 515 (6th Cir. 2008)

We recognize that a court makes a probable cause determination on the "totality of the circumstances," United States v. Yusuf, 461 F.3d 374, 390 (3d Cir. 2006), meaning that a court should not isolate pieces of evidence when it determines whether there was probable cause for a prosecution.  Rather, a court should measure the cumulative weight of all of the evidence and account for reasonable inferences that can be drawn from it.  But, taking into account the totality of the evidence other than the confession, appellees do not point to evidence sufficient for us to affirm the summary judgments in the malicious prosecution action on the theory that they had probable cause to initiate the prosecution.

The circumstance that Halsey was thought to have failed the polygraph exam coupled with the fact that he had the opportunity to commit the crimes did not so clearly establish that there was probable cause for the initiation of the criminal proceedings that no reasonable jury could conclude otherwise.  We reach this conclusion even after we consider other factors that could contribute to a finding that there was probable cause for institution of the prosecution that the District Court did not mention, namely Halsey's admitted failure to call the police or delay in calling Urquhart when he discovered that the children were missing as well as the statements that other persons

56

originally made that contradicted Halsey's account of his activities on the night of the murders.

Our determination is in line with that stated by another court of appeals recently in a case involving facts strikingly similar to those here. In Fox v. Hayes, 600 F.3d 819, 835 (7th Cir. 2010), the Court of Appeals for the Seventh Circuit held that an officer's mere "hunch" was not elevated to the level of a reasonable belief necessary for probable cause to institute criminal proceedings, and affirmed a district court's order sustaining the jury's verdict against the defendant in a malicious prosecution case. In that case, the suspect, Kevin Fox, who was the father of a three-year old female murder victim, was, like Halsey, the last known adult present with the victim.[28] When Fox realized that his daughter was missing from the family residence, he did not call immediately the police or the victim's mother, who was away from the family home in a different city, and, instead, unsuccessfully searched for her for 40 minutes. He called the police only when his search had not been successful and even then called a number that he knew was not a police emergency number. Subsequently, Fox took a polygraph examination which the police told him that he had failed. Even though Fox first denied being involved in the murder, he

---

[28] We say that Halsey was the last known adult present with the children because Halsey said that Urquhart went out for the evening on the night of the murders before he did and when Halsey later went out he locked the door and told the children not to let anyone in. As far as we are aware, appellees did not know during the investigation that Hall saw the children after Halsey left the apartment for the evening.

eventually confessed that he had been involved, but then, almost immediately, disavowed the confession.

The case against Fox was perhaps stronger than the case against Halsey because it arguably had incriminating aspects without a parallel here. In this regard, there was potentially incriminatory evidence against Fox because a surveillance video appeared to show a vehicle similar to his being driven during a time he claimed to have been sleeping on the night of the murder. But the court concluded that, when viewed in the light most favorable to Fox, the facts did not so strongly establish that there was probable cause for the institution of criminal proceedings against Fox that the state actor defendant in Fox's malicious prosecution action was entitled to a reversal of the judgment against him entered on a jury verdict. We likewise reject appellees' claim that they are entitled to summary judgment on whether there was probable cause to initiate the proceedings against Halsey. The presence vel non of probable cause was a jury question that the District Court could not resolve on motions for summary judgment.

Accordingly, because a reasonable jury could conclude that: (1) by fabricating Halsey's confession, appellees infected Hancock's decision to charge Halsey, and (2) in the absence of the invalid confession, the facts of the case did not demonstrate conclusively that there was probable cause for Halsey's prosecution, we will reverse the District Court's grant of summary judgment on Halsey's malicious prosecution claim.

C.    Coercion Claim

58

The final aspect of the disposition of appellees' motions for summary judgment that we address is the dismissal of Halsey's claim that appellees coerced him into adopting a confession that they fabricated and by doing so denied him due process of law. The parties sharply dispute how we should resolve the appeal on this issue because, on one hand, the record contains evidence that appellees forced Halsey to sign the incriminating statement by overwhelming his will to continue denying his involvement in the crime but, on the other hand, there is no indication that appellees physically abused Halsey or even tricked him into signing the statement. Our review of the record, considered in the light most favorable to Halsey, convinces us that there is enough of a factual issue to warrant the conclusion that the District Court should have denied the motions for summary judgment on the coercion claim.

We have recognized that "an involuntary confession may result from psychological, as well as physical, coercion." Miller v. Fenton, 796 F.2d 598, 603 (3d Cir. 1986). In deciding whether the evidence in the record compels a conclusion that, as the District Court believed, Halsey could not have been coerced into confessing, we look to the totality of the circumstances. Id. at 604. We, however, do not employ a "but-for" test in addressing this issue. Id. Thus, the circumstance that a suspect would not have confessed if he had not been interrogated does not mean that his confession was involuntary. Id. at 604-05. Accordingly, to sustain a coercion claim in an effort to have his confession excluded from admission into evidence at trial, a criminal defendant must point to some link between police misconduct and the confession. United States v. Jacobs, 431 F.3d 99, 108 (3d Cir. 2005).

A coercion inquiry requires a court to "consider the specific tactics utilized by the police in eliciting the admissions, the details of the interrogation, and the characteristics of the accused."  Miller, 796 F.2d at 604 (quoting Rachlin v. United States, 723 F.2d 1373, 1377 (8th Cir. 1983)) (internal quotation marks omitted).  Specifically, in making that inquiry, we have looked at:

> the youth of the accused; his lack of education or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep.

Id. (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041 (1973)).  This list of factors, however, is not exhaustive, and we also have stated that a court should consider the suspect's familiarity with the criminal justice system when determining whether he was coerced into confessing.  Jacobs, 431 F.3d at 108.

In considering these factors we are mindful that the ultimate question is "whether the defendant's will was overborne when he confessed."  Miller, 796 F.2d at 604.  This question frequently is difficult to answer because "the line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw, particularly . . .  where it is necessary to make fine judgments as to the effect of psychologically coercive pressures and inducements on the mind and will of an accused."  Haynes

60

v. Washington, 373 U.S. 503, 515, 83 S.Ct. 1336, 1344 (1963); see also Colorado v. Connelly, 479 U.S. 157, 164, 107 S.Ct. 515, 520 (1986) ("[A]s interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus.").

Yet a confession is not rendered involuntary simply because the police procured it by using psychological tactics. See Miller, 796 F.2d at 605. Indeed, even the use of deception to procure a confession might not result in its exclusion from admission into evidence at the trial. See, e.g., Frazier v. Cupp, 394 U.S. 731, 739, 89 S.Ct. 1420, 1425 (1969) ("The fact that the police misrepresented the [co-defendant's] statements . . . is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible."); see also United States v. Rutledge, 900 F.2d 1127, 1131 (7th Cir. 1990) ("[T]he law permits the police to pressure and cajole, conceal material facts, and actively mislead – all up to limits . . . ."). By the same token, the circumstance that the police have advised "a suspect of his rights does not automatically mean that any subsequent confession is voluntary." Livers v. Schenck, 700 F.3d 340, 353 (8th Cir. 2012) (internal quotation marks omitted).

The District Court entered summary judgment against Halsey on his coercion claim for two overarching reasons. First, it relied on the presence of factors that it found supported the conclusion that Halsey's confession was voluntary: the investigators gave him his Miranda rights prior to questioning him and did so again before he signed the confession; the investigators did not threaten him or promise him anything of

61

value in return for his confession; the investigators did not physically abuse him or deny him food, drink or breaks; he did not ask to leave the police headquarters before he confessed; and he did not ask for an opportunity to consult an attorney.

Second, the District Court found it significant that appellees were not responsible for reading back Halsey's purported confession or for obtaining his signature as that task fell on Propsner. The Court noted that when Propsner entered the room in which Halsey was being questioned, Halsey could have told Propsner about his objections concerning how appellees obtained his statement or the manner in which he had been interrogated, but he did not do so. The Court also discredited Halsey's claim that he signed the statement because he feared for his life. Thus, the Court indicated that "[Halsey] does not provide any evidence of threats or coercion by Pfeiffer or Lynch to explain his statement that he feared for his life." Halsey, 2013 WL 646200, at *4. The Court concluded that earlier coercion did not cause Halsey to sign the statement, and explained that:

> Since the act of executing the Third Statement after Propsner read it to [Halsey] is the actual time when [Halsey] could have been coerced or manipulated into adopting the confession, and [Halsey] has agreed to dismiss all claims against Propsner, then considering the totality of the circumstances, [Halsey] has failed to show that either Pfeiffer or Lynch manipulated or coerced him in a way that deprived him of his ability to make an unconstrained, autonomous decision to

62

sign the Third Statement.

Id.

The District Court seemed to have viewed the interrogation process as a string of separated events, beginning with appellees questioning Halsey, proceeding with Propsner entering the room to review Halsey's statement, and culminating with Halsey signing his confession. It appears that, to the Court, appellees' conduct during the first stage of the process had no bearing on the resolution of the coercion issue because Halsey signed the confession later without objecting to the process's earlier aspects.

Our precedent forecloses the adoption of this compartmentalized view of the interrogation process in which a court considers the material events independently or disjunctively rather than as connected episodes in an ongoing process. In United States ex rel. Johnson v. Yeager, 327 F.2d 311, 314 (3d Cir. 1963), we reversed the denial of a habeas corpus petition that a defendant in state custody, Wayne Godfrey, had filed. Godfrey had been interrogated for many hours, deprived of sleep and counsel, and, contrary to state law, had not been taken "promptly" for a hearing before a magistrate judge following his arrest. The bulk of Godfrey's interrogation occurred over a night before he confessed the next morning. Id. at 313. Several police officers did the questioning, but they ultimately took Godfrey to a chief detective officer in the morning to whom Godfrey formally confessed. Id. That confession "proceeded smoothly and without apparent reluctance on Godfrey's part." Id. We noted that if we

63

considered only the last aspect of the confession process in addressing the coercion issue, we would have deemed the confession voluntary as the state court had when it admitted the confession into evidence. Id. at 315. But we rejected the conclusion of the state court and held that the "civil manner" in which the chief detective treated the defendant could not have "cured or made irrelevant the events of the preceding 21 hours." Id.

As we held in Yeager, and as we reaffirm today, the compartmentalized view of the interrogation process cannot be squared with settled Supreme Court precedent. "[C]oercion may have a persisting invalidating effect upon a confession," even when the confession is apparently made without "reluctance [and] in response to civil questioning in pleasant surroundings." Id. (citing Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461 (1936) and Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541(1961)). Thus, "[t]he events preceding the formal confession must be considered as well as its immediately attendant circumstances." Id. at 313.[29] Accordingly, Halsey's signature did not extinguish appellees' alleged misconduct during the interrogation.

Our foregoing conclusion leaves us with the question of whether appellees' misconduct could be found to have led

[29] Appellees miss this point in their attempt to distinguish Yeager on its facts, as they fail to account for the principle that we perceive in that case—that an inquiry into the validity of a confession cannot be severed from the interrogation that induced it. See Pfeiffer's br. at 49.

Halsey to make the confession. The pertinent facts on this issue, viewed in light most favorable to Halsey, are compelling. Over the course of less than two days, appellees detained Halsey, a man of limited intelligence and little education, who was unaccompanied by a friend or an attorney, for about 30 hours and questioned him almost continuously for about 17 of those hours, of which about nine were highly confrontational, a period measured from the time Pfeiffer took what Halsey called a "forceful" approach continuing to the time that Halsey signed the confession. Appellees persisted in telling Halsey that he was guilty, "hollering and screaming" at him,[30] despite being aware of Halsey's mental limitations and despite Halsey's repeated protestations of his innocence. Furthermore, Halsey cried and, according to Pfeiffer, went into a trance towards the end of the interrogation. At that point Halsey, who claims that he feared for his life, signed a statement in the appellees' presence even though it included details that only the police and the murderer could have known.[31]

---

[30] Appellees misconstrue the record when they argue that there is no evidence that they "hollered and screamed" at Halsey, other than Halsey's 1988 statement, which they claim is "contradicted by Halsey's deposition testimony." Pfeiffer's br. at 54. Actually, the opposite is true—we see no contradiction in Halsey's deposition testimony and find only support: "I just was arguing with them and going back and forth and no one seemed to be listening to what I was saying, and there was hollering and screaming . . . ." J.A. 276.

[31] Although the circumstance that Halsey was innocent proves

Overall, we are satisfied that Halsey presented enough

he could not have known certain details about the crime that nevertheless were included in his confession, we reject Halsey's broader proposition that his innocence, by itself, could establish that he had been coerced into confessing. He argues that the "optics of innocence changes everything" and asks "[w]hy would the innocent Mr. Halsey, who had repeatedly (and truthfully) denied any involvement in these horrible crimes, have ultimately signed the false confession unless defendants had overborne his will? The obvious answer is he would not have." Appellant's br. at 49. If we accepted this view we would eviscerate the required causal link between police misconduct and the confession. Miller, 796 F.3d at 605 (explaining that "it can almost always be said that the interrogation caused the confession"). It would mean that any suspect who is interrogated prior to his conviction—which is to say almost every suspect—and who confesses but later is absolved of criminal responsibility would have an actionable coercion claim. That consequence, in turn, would ignore the investigators' leeway to use confrontational tactics, including psychological pressure, to elicit information from suspects. See, e.g., United States v. Astello, 241 F.3d 965, 968 (8th Cir. 2001) (holding that a confession was not involuntary where psychological pressure, false promises, and suspect's family were used against him). It also would ignore the unfortunate reality that individuals sometimes falsely confess under significant but permissible pressure. Indeed, sometimes individuals confess on a completely voluntary basis to the commission of crimes that they did not commit.

66

evidence to withstand the motions for summary judgment on the coercion issue. It is true, as the District Court noted and as appellees repeat in their briefs, that Halsey was not beaten, bribed, or threatened. Furthermore, he was advised of his Miranda rights, and, at times, he was given breaks when being questioned. Moreover, given his prior arrests, Halsey had some familiarity in dealing with the police, though his record of repeated arrests suggests that he took away very little from those experiences. In fact, the record does not suggest that he was particularly comfortable in navigating the criminal justice system.[32] Cf. Sims v. Georgia, 389 U.S. 404, 407, 88 S.Ct. 523, 525 (1967) (explaining that "the fact that the police may have warned [the suspect] of his right not to speak [was] of little significance" because he had a third grade education and a mental capacity that was "decidedly limited").

But none of these reasons could justify our affirming the order granting summary judgment. See Schneckloth, 412 U.S.

_____

[32] Lynch disagrees and contends that Halsey's ability to sign the polygraph stipulation and Miranda waiver demonstrates that he had adequate intelligence so that his confession was voluntary. But Lynch makes this contention without pointing to any evidence that Halsey understood the significance of his acts. Lynch's br. at 7. The circumstance that an individual signs a document does not demonstrate that he understands its content. Cf. United States v. Velasquez, 885 F.2d 1076, 1087 (3d Cir. 1989) (holding that a Miranda waiver had been knowing and intelligent in part because the defendant previously had invoked right to counsel, thereby showing that she "understood the import of the Miranda warnings").

at 226, 93 S.Ct. at 2047 ("The significant fact about all of [the cases involving involuntary confessions] is that none of them turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances."). There is no magic set of considerations that justifies the granting of summary judgment on a coercion claim, for "a totality of the circumstances analysis does not permit state officials to cherry-pick cases that address individual potentially coercive tactics, isolated one from the other, in order to insulate themselves when they have combined all of those tactics in an effort to overbear an accused's will." Wilson, 260 F.3d at 953. When we weigh the factors militating against and favoring a finding that Halsey's confession was coerced, we are satisfied that rational jurors reasonably could find that Halsey was coerced into signing the confession.

A recent case from the Court of Appeals for the Eighth Circuit supports our conclusion. Livers, 700 F.3d 340. There, the court affirmed a denial of the defendants' motion for summary judgment that they based on a claim of qualified immunity in an action in which the plaintiff claimed that he had been coerced into confessing in a situation involving facts very similar to those here. The plaintiff, Mathew Livers, who was of substandard intelligence, was questioned for 6.5 hours without counsel, was informed that he failed a polygraph examination, and continued to protest his innocence before finally confessing. Id. at 352-54.

Halsey contends his case is even more compelling than Livers's, pointing to his longer interrogation and to the alleged fabrication of evidence. Appellant's br. at 51-52. On the other

68

hand, appellees identify distinctions between the cases: the denial of food that Livers endured for ten hours; an "uncomfortably cold" room to which he was first taken; promises of "help" and threats of execution; and not being permitted to leave the interrogation room. Pfeiffer's br. at 55.

Though Livers is not entirely analogous to this case, it supports our view that the District Court should not have granted summary judgment on the coercion issue. The physical discomfort visited on Livers, though not similarly present here with respect to appellees' treatment of Halsey, is offset by the longer detention and interrogation that Halsey withstood.[33] The

---

[33] The parties sharply dispute the length of Halsey's interrogation. Halsey arrives at a total of 30 hours by counting all the time he spent in police custody. Appellant's br. at 47. Appellees, for their part, contend that there were only 12 hours of "actual interrogation" time. Pfeiffer's br. at 51. We have no need to decide whose calculations are correct for by any standard appellees subjected Halsey to an extended interrogation. We do note, however, that Halsey includes in his 30-hour calculation the time consumed when he gave his voluntary, non-incriminating statements to appellees, the nap that he took at the police station while waiting for Brannon, the drive to and from the prosecutor's office the following morning, and the polygraph exam—in short, all of the time that he spent with the police. Though we do not ignore the time that a defendant is in custody without being interrogated, see, e.g., Yeager, 327 F.2d at 315 (taking into account both the length of detention and of interrogation), such time should not be conflated with the duration of a continuous interrogation

threats and promises made to Livers likewise are balanced by the visible physical reaction that the interrogation induced in Halsey. Moreover, as far as we can see from the opinion in <u>Livers</u> and the record before us, neither Livers nor Halsey would have had a reasonable belief that he was free to leave the facility in which he was being interrogated. <u>See, e.g., United States v. Barnes</u>, 713 F.3d 1200, 1204-05 (9th Cir. 2013) (holding that the "pressure resulting from a combination of the surroundings and circumstances" of being in a "police-dominated, confined environment" did not give a reasonable person the impression that he was free to leave even though he was not handcuffed, formally arrested, or physically intimidated).[34]

We are also mindful of the expert report of Psychology Professor Saul M. Kassin regarding the nature of Halsey's interrogation and his confession.[35] <u>Cf. Strickland v. Francis</u>, 738 F.2d 1542, 1555 (11th Cir. 1984) (reversing denial of

_____

designed to extract a confession.

[34] We are aware that Halsey did not complain to Propsner about appellees' treatment of him. But we are not impressed with this circumstance as we doubt that Halsey viewed Propsner as a sympathetic figure and we believe that, in the intimidating surroundings of a police station, Halsey would have been reluctant to complain to Propsner about his treatment.

[35] Neither the District Court nor appellees mentioned Kassin's report even though it was part of the record on the summary judgment motions and even though Halsey has discussed it in his trial and appellate briefs.

habeas petition in part because the jury lacked reason to disagree with the "unambiguous and uncontradicted opinions" of expert witnesses regarding defendant's competence to stand trial). The report supports Halsey's position that he was coerced into signing a false statement.

Dr. Kassin reviewed the coercive aspects of Halsey's interrogation as well as Halsey's attributes and concluded that "the Halsey statement contained multiple hallmarks of a false confession." J.A. 674. Dr. Kassin explained Halsey's vulnerabilities as a suspect: his mental limitations, his history of mental health issues and substance abuse, and his suggestibility (as reported by a test Halsey took). These are all characteristics that Kassin explained have been shown to contribute to false confessions. Kassin also analyzed the interrogation itself and concluded that its length (much longer than average) and the tactics used (overwhelming Halsey with supposedly incriminating evidence) also increased the chances that Halsey would agree to sign a false confession to end the confrontation—all suggesting that his will was overborne.

It is important to recognize that, unlike issues requiring a technical understanding, the question of whether a criminal defendant was coerced is a matter well within "lay competence" and thus a jury is not foreclosed from considering whether there was coercion even if there is "unequivocal, uncontradicted and unimpeached testimony of an expert" addressing the issue. Quintana-Ruiz v. Hyundai Motor Corp., 303 F.3d 62, 76-77 (1st Cir. 2002). In any event, here we cite the expert's report only to support the conclusion that there was a genuine dispute of material fact on the issue of whether the appellees obtained

71

Halsey's signature on the confession through coercion. <u>See</u> <u>Thomas v. Newton Int'l Enters.</u>, 42 F.3d 1266, 1270 (9th Cir. 1994) (holding that expert opinion created material dispute when included with other evidence and noting that it is generally "itself sufficient to create a genuine issue of disputed fact sufficient to defeat a summary judgment motion"). For these reasons, and because appellees do not rely on the absence of established law in pressing their contention that they had qualified immunity on Halsey's coercion claim, we will reverse the summary judgment in their favor on the coercion claim.

## VI.    CONCLUSION

For the foregoing reasons, we will reverse the District Court's February 21, 2013 order granting appellees summary judgment on Halsey's fabrication, malicious prosecution, and coercion claims. We also will reverse the summary judgment on Halsey's parallel state law claims, which appellees concede are coextensive with his federal claims. Pfeiffer's br. at 57 (citing <u>Wildoner v. Borough of Ramsey</u>, 744 A.2d 1146, 1153 (N.J. 2000)).[36] We will reinstate the reversed claims and will remand the case to the District Court for further proceedings consistent with this opinion.

---

[36] Because Halsey has not appealed the dismissal of his 42 U.S.C. § 1983 claim based on <u>Brady v. Maryland</u>, the portion of the February 21, 2013 order dealing with that claim will remain undisturbed.