**OCEAN CITY EXPRESS CO., INC., Plaintiff,**

v.

**ATLAS VAN LINES, INC., Defendant.**

**Civil Action No. 13-1467 (JBS/KMW)**

United States District Court, D. New Jersey.

Signed July 11, 2016

Filed July 12, 2016

**316**

Jeffrey H. Sutherland, Esq., JEFFREY H. SUTHERLAND, PC, Linwood Commons, 2106 New Road, Suite E-5, Linwood, NJ 08221, Attorney for Plaintiff.

Gary Francis Seitz, Esq., GELLERT SCALI BUSENKELL & BROWN LLC, Curtis Center, 601 Walnut Street, Suite 280 South, Philadelphia, PA 19106, Attorney for Defendant.

### OPINION

SIMANDLE, Chief Judge:

#### Contents

I. INTRODUCTION...316

II. BACKGROUND...318

III. STANDARD OF REVIEW...321

A. Summary Judgment Standard, Generally...321

IV. DISCUSSION...321

A. New Jersey Franchise Practices Act...321

 1. 20% Requirement...322

 2. Status as an "Innocent Franchisee"...324

B. Evidence of Damages caused by Atlas' alleged violation of the NJFPA...325

 1. Loss of Earnings/Revenues...325

 a. Mr. Portock's Opinion is Admissible...325

 b. Mr. Webers' Testimony has some Relevance...327

 2. Costs of De-branding...328

V. CONCLUSION...329

### I. INTRODUCTION

In this action, Plaintiff Ocean City Express Co., Inc. (hereinafter, "Plaintiff" or "Ocean City Express" or "Ocean City") alleges that Defendant Atlas Van Lines, Inc. (hereinafter, "Defendant" or "Atlas Van Lines" or "Atlas") violated the New Jersey Franchise Practices Act, N.J.S.A. §§ 56:10–1, –15 (hereinafter, the "NJFPA" or the "Act") when it terminated the parties' March 31, 2006 Agency Agreement without "good cause."

In enacting the NJFPA, the New Jersey Legislature aimed "to equalize the disparity of bargaining power in franchisor-franchisee relations," Liberty Lincoln–Mercury v. Ford Motor Co., 134 F.3d 557, 566 (3d Cir.1998) (citations omitted), by prohibiting a franchisor from terminating, cancelling, or failing to renew a franchise without sufficient " 'good cause.' " Cooper Distrib. Co. v. Amana Refrigeration, Inc., 63 F.3d 262, 268 (3d Cir.1995) (quoting N.J.S.A. § 56:10–5); see also N.J.S.A. § 56:10–2 (listing the legislative findings underpinning the NJFPA). The NJFPA, however, applies only (1) where the franchisee maintains a place of business within the State of New Jersey, (2) where gross sales between the franchisor and franchisee exceeded $35,000 for the 12 months that preceded the suit, and (3) where the franchisee derived or intended to derive more than 20% of its overall gross sales from the franchise arrangement. See N.J.S.A. § 56:10–4.

Against that statutory backdrop and following multiple rounds of dismissal motion practice,[1] Defendant moves for summary judgment, on the grounds that the undisputed factual record demonstrates that the NJFPA has no application to the parties' Agency Agreement. (See generally Def.'s Br.; Def.'s Reply.) More specifically, Defendant takes the view that the arrangement cannot qualify as a "franchise" for purposes of the NJFPA, (1) because the unrebutted testimony reflects that Plaintiff derived less than 20% of its gross sales from the Agency Agreement, and (2) because its "noncompliance" with the Agency Agreement precludes it, in any event, from relying upon the " 'innocent franchisee' " protections of the NJFPA. (Def.'s Br. at 3-7, 14-19; Def.'s Reply at 12-14.) Moving beyond the coverage requirements of the NJFPA, Defendant then claims that Plain-

tiff's NJFPA claim necessarily fails on the merits for lack of evidence on the issues of damages (whether in the form of lost earnings, costs to de-brand, or otherwise).[2] (See Def.'s Br. at 7-14; Def.'s Reply at 3-8.)

Plaintiff, in opposition, largely admits that its actual gross sales dropped below the 20% threshold of the NJFPA, and concedes its own "technical" noncompliance with the Agency Agreement. (Pl.'s Opp'n at 2, 5-8; see also Terne Cert.; Terne Dep.) Nevertheless, Plaintiff attributes its "forced" violation and depressed sales to the " 'unreasonable' " requirements of a "scheme"[3] developed by Defendant which blocked Plaintiff from bidding on projects offered by its largest customer, Cartus Corporation (hereinafter, "Cartus").[4] (Id.) Plaintiff similarly concedes, as detailed above, its violations of the Agency Agreement, but again attributes its non-

1. The Court has addressed the plausibility of Plaintiff's NJFPA claims on three separate occasions. See, e.g., Ocean City Exp. Co. v. Atlas Van Lines, Inc., 46 F.Supp.3d 503 (D.N.J.2014) (finding that Plaintiff alleged a plausible NJFPA claim, and denying Defendant's motion to dismiss); Ocean City Exp. Co. v. Atlas Van Lines, Inc., No. 13–1467, 2014 WL 654589 (D.N.J. Feb. 19, 2014) (granting Defendant's dismissal motion, and dismissing Plaintiff's NJFPA claims without prejudice); Ocean City Exp. Co. v. Atlas Van Lines, Inc., No. 13–1467, 2013 WL 3873235 (D.N.J. July 25, 2013) (granting Defendant's dismissal motion, and dismissing Plaintiff's NJFPA claims without prejudice). Armed with these dismissal decisions, Plaintiff argues that this Court has already "addressed and resolved" the question of whether Plaintiff "has met all of the prima facie requirements" of an NJFPA claim. (Pl.'s Opp'n at 2 (emphasis in original).) Nevertheless, the evidentiary standard under Federal Rule of Civil Procedure 56 differs " 'in critical respects' " from the plausibility standard of Federal Rule of Civil Procedure 12(b)(6), most notably in that no presumption of truth attaches to the allegations of the complaint at the summary judgment phase. Fowler v. UPMC Shadyside, 578 F.3d 203, 213 (3d Cir.2009) (citation omitted) (describing summary judgment as a "much

more stringent standard" than that applied in connection with dismissal motion practice). In that way, a " 'well-pleaded complaint' " may survive dismissal even if the prospect of recovery under the facts alleged seems " 'improbable' " and/or " 'remote.' " Id. (citation omitted). The "evidentiary inquiry" on summary judgment, by contrast, "defines the quantum of proof [the] plaintiff must present to create" a genuine factual issue for trial. Id. (citation omitted). For that reason, Plaintiff's reliance upon the dismissal decisions misses the mark.

2. In addition, Defendant challenges Plaintiff's expert and factual evidence relative to damages on reliability and materiality grounds, among other bases. (See Def.'s Reply at 6-9.) For the reasons discussed below, the Court largely rejects these challenges.

3. Although the Court recites Ocean City's claim of a "scheme" in the prefatory portions of this Opinion, Ocean City's new and previously undisclosed allegations of a "scheme" in violation of N.J.S.A. § 56:10–7(e) will be disregarded for the reasons explained below.

4. Cartus provides relocation services for corporations and other entities, and relies upon moving companies (like Ocean City Express)

compliance to the "'unreasonable'" requirements of Defendant's "no bidding scheme." (Id.) Based upon these allegations, Plaintiff advances the view that the essential fabric of this litigation—the ruinous effects of a "'no bidding scheme'" imposed by the franchisor—falls well within the protective and remedial purposes of the NJFPA. (Id. at 11–14.) Turning then to the question of damages, Plaintiff argues that the record contains "clear evidence" that Defendant's termination of the Agency Agreement caused a loss of revenue and expenses related to de-branding, even though it lacks specific written documentation of these damages. (Id. at 8–11.)

In addressing these competing positions, the Court must address two largely interconnected issues. <u>First</u>, the Court must consider the scope of the NJFPA's 20% gross sales requirement, and must then decide whether the undisputed factual record creates a triable issue concerning whether the NJFPA governs the parties' Agency Agreement. <u>Second</u>, the Court must determine whether Plaintiff's evidence of damages meets its prima facie burden.

For the reasons that follow, Defendant's motion for summary judgment will be denied.

## II. BACKGROUND [5]

### A. Factual and Procedural Background [6]

Ocean City Express, a family-owned and operated moving company out of Pleasantville, New Jersey, provides mostly local and intrastate moving services throughout the Northeast. (<u>See</u> Terne Cert. at ¶¶ 2-3) [7]

---

to provide part of these services. (<u>See</u> Pl.'s Supp. SMF at ¶ 7; Def.'s R. Supp. SMF at ¶ 7.)

5. The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.

6. The Court distills this undisputed version of events from the parties' statements of material facts, affidavits, and exhibits, and recounts them in the manner most favorable to Plaintiff, as the party opposing summary judgment. The Court disregards, as it must, those portions of the parties' statements of material facts that lack citation to relevant record evidence (unless admitted by the opponent), contain improper legal argument or conclusions, or recite factual irrelevancies. <u>See</u> generally L. Civ. R. 56.1(a); <u>see</u> also <u>Kemly v. Werner Co.</u>, 151 F.Supp.3d 496 (D.N.J.2015) (disregarding portions of the parties' statements of material facts on these grounds); <u>Jones v. Sanko Steamship Co., Ltd.</u>, 148 F.Supp.3d 374 (D.N.J.2015) (same). Application of these principles requires, in practical terms, that the Court disregard portions of Plaintiff's responsive and supplemental statement of facts, particularly to the extent Plaintiff attempts to draw certain analogies between the parties' dispute in this case, and Defendant's relationship with non-party moving companies. (<u>See,</u> e.g., Pl.'s Supp. SMF at ¶¶ 24-25.)

7. Defendant deems the affidavit of Thomas Terne, the President of Ocean City, a "sham" because it purportedly contradicts the testimony he provided during his deposition. (Def.'s Reply at 6-8.) More specifically, Defendant takes exception with the fact that the affidavit estimates the cost of debranding (borne from Atlas' termination) as $168,000, when Mr. Terne admitted during his deposition that Ocean City has no evidence on the cost of debranding. (Def.'s Reply at 7; <u>compare</u> Terne Cert. at ¶¶ 11-12, <u>with</u> Terne Dep. at 129:19-21, 134:14-17 (generally acknowledging that Ocean City lacks any specific records evidencing the costs of debranding).) The sham affidavit doctrine generally embodies the notion that "'a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict.'" <u>Jiminez v. All Am. Rathskeller, Inc.</u>, 503 F.3d 247, 251 (3d Cir.2007) (citations omitted); <u>see</u> also <u>In re CitX Corp., Inc.</u>, 448 F.3d 672, 679 (3d Cir.2006) (describing the sham affidavit doctrine as the practice of disregarding affidavits that contradict prior or later deposition testimony "in an attempt to create a genuine issue of material fact" on summary judgment). Defendant's position on the application of the sham affidavit doctrine in this

Atlas Van Lines, by contrast, focuses primarily upon interstate and international transportation services for "household goods and general commodities" as a "motor carrier registered with the Department of Transportation." (Ex. A to Def.'s SMF.) In connection with these services, and in an effort to enhance its geographic reach, Atlas enlists "limited [local] agent[s]" to book, ship, and haul interstate shipments under its interstate transportation authority (from the Department of Transportation). (Id.)

Along those lines, on March 31, 2006, Ocean City Express executed the "ATLAS VAN LINES CO., INC. AGENCY AGREEMENT" (hereinafter, the "Agency Agreement"), which empowered Ocean City to solicit shipping contracts under Atlas' interstate carrier authority, and to haul interstate shipments under Atlas' name, signage, and branding, for a period of at least three years.[8] (See id.; see also Def.'s SMF at ¶ 7; Pl.'s RSMF at ¶ 7.) In other words, the Agency Agreement, in practical terms, allowed Ocean City Express to benefit, commercially, from Atlas' established reputation, market recognition, and interstate authority, but required it to rebrand its existing fleet of moving trucks in accordance with Atlas' visual identity.

(See generally Terne Cert. at ¶ 7.) Beyond that, the Agency Agreement required Ocean City to register all interstate shipments with Atlas, and precluded it from using Atlas-branded equipment or material assets for any other interstate (or, rival) carrier. (See Def.'s SMF at ¶¶ 11-12, 15; Pl.'s RSMF at ¶¶ 11-12, 15.) The Agreement then specified that Atlas could terminate the relationship on account of Ocean City's failure to, among other things, comply with "any term of th[e] Agreement," "book, haul or otherwise service a sufficient volume of business," and/or cooperate with any conditions "relative to the business of Atlas." (Ex. A to Def.'s SMF.)

Following execution of the Agency Agreement, the parties' commercial relationship appears to have unfolded in model fashion. (See generally Def.'s SMF; Pl.'s RSMF; Pl.'s Supp. SMF; Def.'s R. Supp. SMF.) Indeed, the Agency Agreement seems to have, at least initially, expanded the scope of Ocean City's business. (See generally Def.'s SMF at ¶¶ 3, 5; Pl.'s RSMF at ¶¶ 3, 5; Terne Cert. at ¶¶ 6, 13.) In early 2008, however, Ocean City's largest client, Cartus, instituted a competitive "bidding system" that essentially required moving companies—like, Atlas, Ocean City, and its competitors—to undercut or

---

instance, however, relies upon an overly narrow parsing of language, and ignores Plaintiff's partial concession on the issue of damages. Indeed, in connection with the pending summary judgment motion, Plaintiff admits that it has no written documentation evidencing its alleged damages for rebranding. (See Def.'s SMF at ¶ 24; Pl.'s RSMF at ¶ 24 ("[a]dmitt[ing] that Plaintiff [Ocean City] has no written documentation" supporting its damages).) In his affidavit, Mr. Terne, in turn, provides his "best" estimation of the "costs to de-brand" all while recognizing that Ocean City has "no separate records outlining these costs." (Terne Cert. at ¶¶ 11-12.) Given the manner in which Mr. Terne qualified his affidavit, the Court can find no contradiction requiring that his affidavit be disregarded. See Hojnowski v. Berks Cnty., No. 13–5618,

2016 WL 725250, at *7 (E.D.Pa. Feb. 23, 2016) (declining to disregard an affidavit under the sham affidavit doctrine). This determination does not, however, resolve the question of whether Mr. Terne's estimation suffices to create a triable issue on the question of damages (the position essentially advanced by Plaintiff) or amounts to little more than unsubstantiated speculation (the contrary position staked out by Defendant). The Court addresses that issue, among others relative to damages, in Section IV.B.

8. Prior to entering into the three-year Agency Agreement, Ocean City had a five-year contract with Atlas. (See Terne Cert. at ¶ 4.) The contours of the initial five-year contract, however, play no role in this litigation.

discount rival shipping rates in order to secure Cartus shipping contracts. (Weber Dep. at 13:15-14:14; see also Pl.'s Supp. SMF at ¶¶ 4, 11, 14; Def.'s R. Supp. SMF at ¶¶ 4, 11, 14.) Atlas, in turn, blocked its agents from submitting any bid lower than a 67% discount off of Atlas' standard rates in order to "preserve [its] rate structure." (See Weber Dep. at 14:15-15:13; see also Pl.'s Supp. SMF at ¶¶ 4-5, 16; Def.'s R. Supp. SMF at ¶¶ 4-5, 16.) Stated differently, Atlas imposed a strict baseline (or, floor) for any discounted bidding on Cartus shipping contracts, in an effort to discourage Cartus from maintaining its competitive bidding scheme. (See Weber Dep. at 14:15-15:13.)

Atlas' policy directive, in turn, had a purportedly deleterious effect on Ocean City's ability to compete for contracts with Cartus—a company which comprised approximately 90% of Ocean City's book of business. (Pl.'s Supp. SMF at ¶ 14; Def.'s R Supp. SMF at ¶ 14; Terne Cert. at ¶¶ 14, 20.) More specifically, Atlas' cap on rate discounts appears to have allowed competing companies to easily underbid Ocean City. (See generally Terne Dep.) As a result, in June 2008, Ocean City's principal, Thomas Terne, reactivated its interstate carrier authority, and formed a new company, Atlantic Express L.L.C. (hereinafter, "Atlantic Express"), in order "to bid at a lower [and unrestricted] rate on Cartus jobs." (Pl.'s Supp. SMF at ¶ 16; Def.'s R. Supp. SMF at ¶ 16; Def.'s SMF at ¶ 3; Pl.'s RSMF at ¶ 3; Terne Cert. at ¶¶ 20-21.) In other words, Ocean City's principal formed a "non-Atlas company" to sidestep the requirements of the Agency Agreement—and specifically Atlas' restriction on Cartus bidding—by diverting its Cartus business through Atlantic Express (a company free from the restrictions of the Agency Agreement and Atlas' rate policy). (Terne Cert. at ¶¶ 19-20; see also Terne Dep. at 23:11-15, 40:5-9, 46:5-8.)

Atlantic Express then proceeded to place unrestricted bids on Cartus' projects (essentially on behalf of Ocean City), causing the number of shipments for Cartus "that Ocean City booked with Atlas [to] decrease[ ] dramatically, going from 274 shipments in 2008, to 48 shipments in 2009, [and then] 12 shipments in 2010." (Def.'s SMF at ¶¶ 5-6; Pl.'s RSMF at ¶¶ 5-6.) The decreased bookings resulted, in turn, in a commensurate decrease in "net billed charges" under the Agency Agreement from "in excess of $3 million in 2008 to less than $130,000 in 2010." (Def.'s SMF at ¶¶ 5-6; Pl.'s RSMF at ¶¶ 5-6.)

Against the backdrop of the sharp decline in revenues, coupled with Atlantic Express being "recognized at Cartus meetings" as the alter-ego of Ocean City, on December 17, 2010, Atlas terminated the Agency Agreement with Ocean City effective January 30, 2011. (Def.'s SMF at ¶ 6; Pl.'s RSMF at ¶ 6; Ex. E to Pl.'s Supp. SMF.) As a result of Atlas' termination, Ocean City filed a series of Amended Complaints in this action,[9] alleging that Atlas violated the NJFPA by terminating the Agency Agreement without good cause,[10]

---

**9.** Atlas removed this action to this federal Court on March 11, 2013. [See generally Docket Item 1.]

**10.** Although Ocean City asserts in its briefing that Atlas' no-bidding-scheme violated the NJFPA by " 'imposing unreasonable standards of performance upon" it (see, e.g., Pl.'s Opp'n at 11-12), Ocean City's Second Amended Complaint, as detailed below, contains no allegations under N.J.S.A. § 56:10-7(e) (the provision of the NJFPA directed at the imposition of "unreasonable standards of performance upon a franchisee"), and makes no mention of a scheme, Cartus, and/or unreasonable standards of performance. (See Compl. at ¶¶ 9-14 (alleging **only** that Atlas violated the NJFPA by terminating the Agency Agreement without good cause).)

and caused Ocean City to suffer damages in the form of lost earnings, costs of debranding, as well as other expenses.[11] (See Second Am. Compl. at ¶¶ 10-13.) In the aftermath of dismissal motion practice and a lengthy period of pretrial factual discovery, the pending motion for summary judgment followed.

## III. STANDARD OF REVIEW

### A. Summary Judgment Standard, Generally

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Alabama v. North Carolina, 560 U.S. 330, 344, 130 S.Ct. 2295, 176 L.Ed.2d 1070 (2010) (citations and internal quotation marks omitted); see also FED. R. CIV. P. 56(a).

In evaluating Defendant's motion for summary judgment, the Court must view the material facts in the light most favorable to the non-moving party, Ocean City, and make every reasonable inference in that party's favor. See Scott v. Harris, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir.2014). An inference based upon " 'speculation or conjecture,' " however, " 'does not create a material factual dispute sufficient to defeat summary judgment.' " Halsey, 750 F.3d at 287 (citations omitted). Rather, the non-moving party must support each essential element with concrete record evidence. See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," the Court may grant summary judgment. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## IV. DISCUSSION

In this case, Atlas advances two largely-interconnected arguments in support of its bid for summary judgment on Ocean City's NJFPA claim. First, Atlas takes the view that the Agency Agreement does not qualify for the remedial protections of the NJFPA, because Ocean City's gross sales under the Agreement fell short of the statutory threshold, and because its deliberate violations of the Agency Agreement preclude it from seizing upon the provisions of the NJFPA. Second, and assuming the NJFPA applies, Atlas argues that Ocean City's NJFPA claim fails on the merits, because Ocean City has put forth no evidence of damages, and instead relies only upon speculation. The Court will address each argument in turn.

### A. New Jersey Franchise Practices Act

In enacting the NJFPA, the New Jersey legislature aimed to remedy a historic imbalance of power in the world of franchisor-franchisee relations, by protecting innocent franchisees against "indiscriminate terminations and nonrenewals," Red Roof Franchising, LLC v. Patel, 877 F.Supp.2d 124, 137 (D.N.J.2012) (citation omitted), and by " 'prohibiting the inclusion in the contract of provisions that would relieve franchisors of liability . . . or would unfairly prejudice the franchisee in the operation of its franchise.' " S. Gas, Inc. v. Exxonmobil Oil Corp., No. 09–6236, 2016 WL 816748, at *7 (D.N.J. Feb. 29, 2016) (quoting Kubis & Perszyk Assocs., Inc. v. Sun Microsystems, Inc., 146 N.J. 176, 680 A.2d 618, 628 (1996) (citing N.J.S.A. 56:10–7));

---

11. Atlas, in turn, asserted Counterclaims for breach of contract, on account of Ocean City's various alleged breaches of the Agency Agreement. [See Docket Item 29.] Atlas, however, has not sought summary judgment on its Counterclaims, and the dispositive motion deadline expired on January 22, 2016. [See Docket Items 49 & 50.]

see also Maple Shade Motor Corp. v. Kia Motors of Am., Inc., 384 F.Supp.2d 770, 774 (D.N.J.2005) (citations omitted) (same), aff'd sub nom., 260 Fed.Appx. 517 (3d Cir.2008). Against those purposes, the relevant provisions of the NJFPA make it a violation of the statute "to terminate, cancel, or fail to renew a franchise without good cause," N.J.S.A. § 56:10–5, and/or "[t]o impose unreasonable standards of performance upon a franchisee." [12] N.J.S.A. § 56:10–7(e).

◼ The protections of the NJFPA, however, apply only to a "franchise," which the statute defines as:

> a written arrangement for a definite or indefinite period, [1] in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and [2] in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.

N.J.S.A. § 56:10–3a (emphasis added). In other words, a franchise under the NJFPA requires the franchisor's grant of a license to the franchisee and a community of interest between the parties in the relevant market.[13] See, e.g., Orologio of Short Hills, Inc. v. Swatch Grp. (U.S.) Ltd., Inc., No. 11–6854, 2015 WL 4496653, at *4 (D.N.J. July 23, 2015) (citing Colt Indus., Inc. v. Fidelco Pump & Compressor Corp., 844 F.2d 117, 119 (3d Cir.1988)); see also Coo-

per Distributing Co., Inc. v. Amana Refrigeration, Inc., 63 F.3d 262, 268–69 (3d Cir. 1995) (same).

◼ Despite the breadth of this definition, however, not all franchises fall within the ambit of the NJFPA's protections. Rather, the NJFPA

> applies **only** to a franchise [1] the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey, [2] where gross sales of products or services between the franchisor and franchisee covered by such franchise shall have exceeded $35,000.00 for the 12 months next preceding the institution of suit pursuant to this act, and [3] where more than 20% of the franchisee's gross sales **are intended to be or are derived** from such franchise.

N.J.S.A. 56:10–4 (emphases added). In other words, these primarily monetary requirements "single[ ] out for protection" the franchisees "that are especially vulnerable to the disproportionate power of franchisors." Boyle v. Vanguard Car Rental USA, Inc., No. 08–6276, 2009 WL 3208310, at *5 (D.N.J. Sept. 30, 2009).

### 1. 20% Requirement

As relevant here, though, Atlas seizes upon the final requirement, and argues that summary judgment must be granted on Plaintiff's NJFPA claim, because the

---

12. The NJFPA codifies a special definition of "good cause," and specifically limits the concept "to failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise." N.J.S.A. § 56:10–5; see also General Motors Corp. v. New A.C. Chevrolet, Inc., 263 F.3d 296, 319–320 (3d Cir.2001) (generally explaining that the NJFPA includes a specialized definition of "good cause"); Atl. City Coin & Slot Serv. Co. v. IGT, 14 F.Supp.2d 644, 658 (D.N.J.1998) (citation omitted) (same). The NJFPA provides, by contrast, no statutory definition for "unreasonable standards of performance,"

N.J.S.A. § 56:10–7(e), and courts apply this provision in slightly different ways. See, e.g., S. Gas, Inc., 2016 WL 816748, at *7. The various inquiries, however, mostly describe " 'arbitrariness, bad intent or economic ruin ... [as] the hallmarks of an unreasonable standard of performance.' " S. Gas, Inc., 2016 WL 816748, at *7 (citation omitted) (surveying the various approaches to defining " 'unreasonable standards of performance' ").

13. Atlas does not challenge Ocean City's ability to meet these requirements in connection with the pending summary judgment motion.

unrebutted evidence reflects that Ocean City derived less than 10% of its revenues (or, gross sales) from the Agency Agreement in 2010 (i.e., the twelve-month period prior to the filing of this lawsuit). (See, e.g., Def.'s Br. at 3-7; Def.'s Reply at 12-13.) Atlas' position, however, misses the far-reaching nature of the NJFPA, and ignores the economic reality underpinning the parties' execution of the Agency Agreement.

On this issue, the Court recognizes, at the outset, the unequivocal testimony concerning the "[v]ery little" revenue that Ocean City derived from Atlas work in 2010. (Terne Dep. at 25:24-26:14.) Indeed, during his deposition, Mr. Terne (the president of Ocean City) admitted that, in 2010, Ocean City generated only $75,000 in revenue from the Agency Agreement, but had overall revenues of $2,762,945.21. (See, e.g., id. at 87:18-24, 119:18-120:18.) In other words, Ocean City readily concedes that it derived only 2.71% of its gross sales from the Agency Agreement, i.e., an amount far less than the 20% actual gross sales floor imposed by the NJFPA. (See Def.'s SMF at ¶¶ 21-22; Pl.'s RSMF at ¶¶ 21-22.)

That undisputed fact, viewed in isolation, plainly favors Atlas' bid for summary disposition of Ocean City's NJFPA claim. The relevant provisions of the NJFPA, however, capture far more than actual gross sales derived from the alleged franchise. Indeed, in order to fall within its provision, the NJFPA requires, more broadly, that "20% of the franchisee's gross sales **are intended to be or are derived**" from the alleged franchise. N.J.S.A. 56:10-4 (emphasis added).

In reviewing this language, the Court interprets the provision, as it must, "consistent with its plain meaning." Oberhand v. Dir., Div. of Taxation, 193 N.J. 558, 940 A.2d 1202, 1207 (2008) (citation omitted). Here, the plain language proves clear (even if surprisingly broad), and compels, on its face, an inquiry into the scope of intended revenues, in addition to actual revenues.[14] See N.J.S.A. 56:10-4; see also Liberty Lincoln-Mercury v. Ford Motor Co., 134 F.3d 557, 566 (3d Cir.1998) (citations omitted) (explaining that remedial statutes, like the NJFPA "must be construed broadly to give effect to their legislative purposes"); Coraud LLC v. Kidville Franchise Co., LLC, 109 F.Supp.3d 615, 624 (S.D.N.Y.2015) (interpreting the NJFPA and noting its breadth).

From that premise, the disposition of Atlas' challenge to Ocean City's NJFPA claim becomes relatively uncomplicated, because even a cursory inspection of the factual record makes plain that the parties—or at least Ocean City—intended for Ocean City to derive more than 20% of its gross sales from the Agency Agreement. Indeed, in 2008, Ocean City "booked" $3 million worth of shipments with Atlas, and from that fact alone, this Court can reasonably infer that the parties intended for Ocean City's gross sales under the Agency Agreement to eclipse 20% of its overall revenues. (See Def.'s SMF at ¶ 6; Pl.'s RSMF at ¶ 6.) Beyond that, the testimony of Mr. Terne creates the impression that Ocean City contracted with Atlas specifically for the purpose of substantially expanding its business. (See, e.g., Terne

---

14. Scant, if any, authority spells out the precise meaning of the phrase "intended to be" for purposes of the NJFPA, N.J.S.A. 56:10-4, with most cases focuses their attention on the "place of business" requirement under the NJFPA. See, e.g., Navraj Rest. Grp., LLC v. Panchero's Franchise Corp., No. 11-7490, 2013 WL 4430837, at *5 (D.N.J. Aug. 15, 2013). Nevertheless, this Court must construe "the NJFPA 'as it is written,'" and the relevant provision in this instance broadly speaks in terms of intended and actual gross sales/revenues. Liberty Lincoln-Mercury, 134 F.3d at 566 (citation omitted).

Cert. at ¶ 6; Terne Dep. at 34:18-35:10.) Given this evidence, and particularly Ocean City's actual revenues in the early days of the Agency Agreement, a reasonable factfinder could well conclude that Ocean City meets the 20% requirement of the NJFPA, due to the parties' intent, as a matter of law.

### 2. Status as an "Innocent Franchisee"

Apart from its challenges under the specific requirements of the NJFPA, Atlas advances the notion that Ocean City's undisputed violations of the Agency Agreement "negate[ ]" any application of the NJFPA, because the statute protects only an " 'innocent franchisee.' " (Def.'s Br. at 14-15.) In other words, Atlas takes the view, in essence, that Ocean City's unclean hands prevent it from asserting the protections of the NJFPA. (See generally id.)

■ The New Jersey legislature enacted the NJFPA to protect "the innocent franchisee when the termination occurs at the franchisor's convenience." Westfield Ctr. Serv., Inc. v. Cities Serv. Oil Co., 86 N.J. 453, 432 A.2d 48, 55 (1981). Nevertheless, the statute itself addresses the issue of a franchisee's violations of an agreement through the "good cause" requirement for termination, and not through any threshold requirement of innocence. N.J.S.A. § 56:10-5. Indeed, the NJFPA specifically defines "good cause" as the "failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise." Id. In that way, the statutory analysis already accounts for violations of the franchise agreement, like those identified by Atlas and largely unchallenged by Ocean City. (See, e.g., Def.'s SMF at ¶¶ 11-17, 27-28; Pl.'s RSMF at ¶¶ 11-17, 27-28; Terne Dep. at 20:20-21:14, 45:14-46:8 (acknowledging various violations of the Agency Agreement); Ex. F to Def.'s SMF (reproducing Ocean City's admissions of "technical violation[s]" of the Agency Agreement, based upon its diversion of Cartus work to Atlantic Express).) Atlas' position, by contrast, would effectively superimpose an additional innocence analysis in excess of the statutory requirements of good cause. Such a proposal, however, finds no support in the plain language of the statute, nor in case law. Atlas' argument on the issue of innocence therefore misses the mark.[15]

---

**15.** Atlas relatedly takes aim at Ocean City's "new" allegations of "a 'scheme' by Atlas to boycott Plaintiff's largest source of revenue," Cartus. (Def.'s Reply at 9-12.) More specifically, Atlas argues that Ocean City's "allegation of a 'scheme' " amounts to "nothing but speculation," and has no relevance to the single issue in this case: whether Atlas' decision to terminate the Agency Agreement rested upon good cause. (Id. at 10-11.) In its briefing, Ocean City claims that its allegation of a scheme relates to its "assert[ion]" that "Atlas violated the Act" by "impos[ing] unreasonable standards of performance" or restrictions on Ocean City's ability to conduct business with Cartus. (Pl.'s Opp'n at 2, 4, 6, 12.) The NJFPA makes it a violation, as explained above, "for any franchisor ... [t]o impose unreasonable standards of performance upon a franchisee." N.J.S.A. § 56:10-7(e). Nevertheless, Ocean City's new "scheme" theory finds no footing in its Second Amended Complaint (see, e.g., Compl. at ¶¶ 9-14 (claiming only that Atlas violated the NJFPA by terminating the Agency Agreement without good cause)), nor the two prior iterations, and Ocean City may not augment its complaint through new assertions raised, at the eleventh hour and for the first time, in opposition to a motion for summary judgment. See, e.g., Bell v. City of Phila., 275 Fed.Appx. 157, 160 (3d Cir.2008) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."); Jake Ball Trust v. Durst, No. 12-5255, 2015 WL 170550, at *6 (D.N.J. Jan. 13, 2015) (citation omitted) (declining to consider new allegations raised for the first time during summary judgment briefing), reconsideration denied, 2015 WL 6121613 (D.N.J. Oct. 15, 2015). Nor should Atlas be called to address a theory of liability that the parties never specifically explored through their lengthy period of pretrial discovery. For all of these reasons, the Court will

For all of these reasons, the Court finds that genuine factual issues preclude Atlas' bid for summary judgment on the issue of whether the NJFPA applies to the parties' Agency Agreement. The Court next addresses whether Ocean City has put forth sufficient evidence of damages.

## B. Evidence of Damages caused by Atlas' alleged violation of the NJFPA

The NJFPA specifies no particular measure for damages derived from violations of its provisions. Rather, the statute states, more generally, that "[a]ny franchisee may bring an action against its franchisor for violation of this act ... to recover damages sustained by reason of any violation of this act and, where appropriate, shall be entitled to injunctive relief." N.J.S.A. § 56:10–10 (emphasis added). In Cooper Distrib. Co. v. Amana Refrigeration, Inc., 180 F.3d 542 (3d Cir.1999), however, the Court of Appeals for the Third Circuit surveyed New Jersey law, and determined that damages under the NJFPA should be measured by " 'either the present value of lost future earnings or the present market value of the lost business,' " together with any actual expenses derived from the termination. Id. at 546 (citation omitted); see also Westfield Centre Service, Inc. v. Cities Service Oil Co., 86 N.J. 453, 432 A.2d 48 (1981) (describing damages under the NJFPA as the "[r]easonable value would be that price upon which willing parties, buyer and seller, would agree for the sale of the franchisee's business as a going concern").

Ocean City claims here that Atlas' termination of the Agency Agreement caused it to incur damages in the form of lost earnings and costs to de-brand its vehicles, buildings, and stationery. (See Compl. at ¶ 13.) In an effort to buttress or substantiate its assertions of damages, Ocean City then points to an "opinion" letter from James F. Portock, C.P.A. (on the issue of lost earnings), the deposition testimony of Frank E. Webers (again, on the issue of lost earnings), and the affidavit of Mr. Terne (concerning the claimed costs of de-branding). (See Pl.'s Opp'n at 8–11; Exs. B, C, & F to Pl.'s Supp. SMF.)

Atlas, however, claims that this evidence provides "[in]sufficient proof of damages," because (1) Mr. Portock provides an unreliable and inadmissible statement of Ocean City's lost earnings, (2) Mr. Weber proffers immaterial testimony related to the commercial relationships of non-parties, and (3) Mr. Terne states only his speculation on the costs of de-branding (without any support in the documentary evidence). (Def.'s Reply at 3–9.) The Court will address each category of damages in turn.

### 1. Loss of Earnings/Revenues

Ocean City's claim of lost earnings hinges upon Mr. Portock's opinion that Ocean City suffered a loss of revenue of $922,155 in 2011 (i.e., the year after Atlas' termination), and the testimony of another franchisee, Mr. Weber, concerning the general importance (from a revenue perspective) of shipping contracts with companies like Cartus. (See, e.g., Pl.'s Opp'n at 8–11; Exs. B & C to Pl.'s Supp. SMF.) Although neither piece of evidence squarely supports Ocean City's theory (and suffers from certain flaws), the evidence, taken together, suffices to create a reasonable inference in its favor on the issue of lost earnings.

### a. Mr. Portock's Opinion is Admissible

Turning first to Mr. Portock, the Court notes that his substantively one-paragraph "expert report" states, in its entirety:

disregard Ocean City's allegation (in its briefing) that Atlas perpetuated a "scheme" in violation of N.J.S.A. § 56:10–7(e).

I HAVE REVIEWED [OCEAN CITY'S] FEDERAL INCOME TAX RETURNS FOR THE YEARS 2010 AND 2011 AND THE RETURNS SHOW A REDUCTION IN GROSS INCOME OF $922,155, A REDUCTION IN [OCEAN CITY'S] SALARY OF $37,000 AND A REDUCTION IN THE NET PROFIT OF THE COMPANY OF $102,255. THIS ACTUALLY CREATED A LOSS OF $34,616 FOR THE YEAR 2011

(Ex. B to Pl.'s Supp. SMF. (emphasis added).) Mr. Portock then attaches the following schedule to show "THE EXACT AMOUNTS THAT [OCEAN CITY] REPORTED ON [ITS] FEDERAL INCOME TAX RETURNS:"

### OCEAN CITY EXPRESS

| | YEAR 2010 | YEAR 2011 | DIFFERENCE |
|---|---|---|---|
| GROSS SALES | $ 2,762,945.00 | $ 1,840,790.00 | $ (922,155.00) |
| OFFICER SALARY | $ 90,650.00 | $ 53,650.00 | $ (37,000.00) |
| NET PROFIT (LOSS) | $ 67,669.00 | $ (34,616.00) | $ (102,285.00) |

(Id. (emphasis in original).) In other words, the opinion of Mr. Portock provides, without qualifying detail or comment, **only** the difference in gross sales between 2010 and 2011. (See id.)

Armed with this opinion, Ocean City argues that it suffered $922,155 in lost revenue on account of Atlas' termination of the Agency Agreement. (See, e.g., Pl.'s Opp'n at 10; see also Pl.'s Supp. SMF at ¶ 1.) Atlas, in turn, argues that Mr. Portock's opinion must be excluded as unreliable, because he failed to conduct a "proper analysis [of] lost profits." (Def.'s Reply at 5.)

 Federal Rule of Evidence 702 "embodies a trilogy of restrictions on expert testimony: [1] qualification, [2] reliability, and [3] fit." Schneider v. Fried, 320 F.3d 396, 404 (3d Cir.2003) (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741–43 (3d Cir.1994)); see also FED. R. EVID. 702. The Daubert requirement at issue here, reliability, focuses upon whether the expert's conclusion rests upon "the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.' " [16] Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 321 (3d Cir. 2003) (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)); see also Kemly v. Werner Co., 151 F.Supp.3d 496, 502–03, 2015 WL 8335030, at *3 (D.N.J. Dec. 8, 2015) (describing the same analytical framework); Krys v. Aaron, 112 F.Supp.3d 181, 189–90 (D.N.J.2015) (same).[17]

16. Atlas mounts no challenge to Mr. Portock's qualifications, nor to the general "fit" of his opinions to the damage issues at play in this litigation. (See generally Def.'s Reply at 5-6.)

17. Where the reliability turns upon the intricacies of an expert's scientific technique, Daubert (and its progeny) directs courts to undertake an inquiry, in essence, into whether the disputed technique has gained acceptance in the relevant scientific community. See In re Paoli, 35 F.3d at 742 n. 8 (listing the relevant factors). These "specific factors neither necessarily nor exclusively applies to all experts," Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); see also Kannankeril v. Terminix Int'l, Inc.,

The Court finds that Mr. Portock's opinion plainly rests upon well-known mathematical methods. Indeed, in his brief opinion, Mr. Portock did little more than basic arithmetic, by subtracting two gross sales figures from Ocean City's income tax returns. (Ex. B to Pl.'s Supp. SMF.) In that way, Mr. Portock provides, in essence, an opinion of Ocean City's balance sheet, not one directed at lost earnings. He makes no mention of the Agency Agreement, Ocean City's past or future work with Atlas, or the cause behind the decrease in revenue. Nor does he claim to have made any present value calculations in accordance with Cooper Distribution.

With that, Atlas' reliability position ultimately attacks the way in which Ocean City seeks to use Mr. Portock's "REDUCTION IN GROSS INCOME" figure, not the substance of his otherwise reliable and narrow opinion. As a result, the Court finds no basis to exclude Mr. Portock's mathematical opinion. See Krys, 112 F.Supp.3d at 189–90 (citation omitted) (explaining that reliability only requires that the expert's opinion rest upon "'good grounds'"). Nevertheless, because Mr. Portock's opinion discloses, on its face, that it concerns only a decrease in Ocean City's gross sales, the Court will not permit his conclusion to be construed as an opinion on damages. Rather, his testimony will be limited to the narrow contours of his report, and will be contextualized and explained to the jury as a balance sheet opinion, and not as a projection of Ocean City's potential recovery under the NJFPA.[18] See Krys, 112 F.Supp.3d at 198–99 (denying the defendants' bid for exclu-

sion, but limiting the expert to the narrow topics discussed in her expert report).

For all of these reasons, Atlas' request to exclude Mr. Portock on admissibility grounds under Federal Rule of Evidence 702 will be denied, without prejudice to Atlas' right to voice appropriate objections during Mr. Portock's testimony at trial.

### b. Mr. Webers' Testimony has some Relevance

Mr. Webers, the owner of a rival moving company and a member of Atlas' Board of Directors, testified in this case on a wide array of topics, ranging from Atlas' rate policy for Cartus work and the commercial importance of Cartus' contracts for smaller moving companies,[19] to the independent relationship of his company with Cartus. (See generally Webers Dep.; Pl.'s Supp. SMF at ¶¶ 2-12, 20.) Ocean City, in turn, looks to Mr. Webers' testimony, in order to buttress its position that Atlas' termination of the Agency Agreement caused a significant loss in revenue for Ocean City. (See Pl.'s Opp'n at 8-11.) More specifically, Ocean City relies upon Mr. Webers' testimony that the loss of a franchise results in "the loss of 'haul backs' and increased costs of operations" for smaller, independent carriers (like, Ocean City). (Id. at 10 (quoting Webers Dep. at 26:7-22, 34:19-36:6).) Atlas, in turn, takes aim at Mr. Webers' testimony, primarily because he provides no specific information concerning the relevant lost earnings of Ocean City. (See Def.'s Reply at 8-9.) In other words, Atlas advances the view that Mr. Webers' testimony should be discarded as irrelevant. (See generally id.) Never-

---

128 F.3d 802, 806–07 (3d Cir.1997).(same), and have no application here, in view of the simplicity and brevity of Mr. Portock's arithmetic.

**18.** The Court will also reinforce this limitation through jury instructions.

**19.** Mr. Webers explains, for example; that the loss of a relationship with Cartus would "kill" a smaller moving company. (Webers Dep. at 17:24-18:9.)

theless, the Court finds Atlas' position without merit.

Indeed, although Mr. Webers' testimony concerns the economic realities, generally speaking, of the relationship between regional and national moving companies, his points about the general financial ramifications of the loss of a franchise provide at least some support for the theory of damages advanced by Ocean City here, and/or at least some evidence to rebut Atlas' argument that Ocean City suffered no damages from termination of the Agency Agreement.[20] Mr. Webers explained, for example, that regional firms have "a disadvantage" in the marketplace without the backing of a national moving company, because regional firms often lack the ability to books shipments for the initial and return trip. (Webers Dep. at 26:7-35:14.) Stated differently, he explained that, if a smaller company sends a "truck to Washington ... [it] probably wouldn't have something coming back," but, if the company "sent it down ... as part of an Atlas shipment, [it] could load something coming back and get a return" (or, revenues for both directions). (Id.) In that way, Mr. Webers' testimony provides at least the contextual backdrop for the sort of lost earnings identified here, even though he offers little, if any, information from which to quantify the relevant amounts at issue here.

For all of these reasons, the Court will not exclude the testimony of Mr. Webers on relevance grounds.

## 2. Costs of De-branding

Finally, the Court turns to Atlas' position concerning Ocean City's lack of evidence on the costs of de-branding.

Resolution of this aspect of Ocean City's damages claim, however, proves relatively straightforward, because Ocean City admits that it has no documentary evidence of its de-branding costs. (See Def.'s SMF at ¶ 24; Pl.'s RSMF at ¶ 24 ("[a]dmitt[ing] that Plaintiff [Ocean City] has no written documentation" supporting its damages).) Rather, Ocean City looks to Mr. Terne's and Mr. Webers' estimation of those costs based upon their experience, and the amount Atlas supposedly paid, at the outset, to brand Ocean City's fleet (i.e., $200,000). (See Pl.'s Opp'n at 11.)

■ Given the generality of these assertions, Atlas argues that the evidence constitutes little more than speculation. On that note, the Court, of course, recognizes that Mr. Terne and Mr. Webers provide their projections of de-branding costs, as opposed to the actual sums incurred by Ocean City for de-branding. Mr. Terne, for example, estimates that Ocean City spent $168,000 on de-branding, because it costs him approximately $6,000 to de-brand/re-paint each of his twenty-eight pieces of equipment. (See Terne Cert. at ¶ 12.) Mr. Webers then consistently explained that it "cost[s] a couple of thousand dollars for labor" to paint each piece of equipment. (Webers Dep. at 47:16-48:12.) These figures, standing alone, come close to being merely speculation. Nevertheless, the Court cannot ignore that the projections closely match the $200,000 sum given to Ocean City for purposes of conforming with Atlas' branding. (See Terne Dep. at 60:3-62:22; see also Ex. D to Def.'s SMF (claiming that, in 2001, Atlas paid Ocean City $200,000 to re-paint trucks, change documents, and its signage).) In that way, the evidence identified by Ocean City creates at least some reasonable inference in its favor on the claim for costs of de-

---

20. In its reply briefing, Atlas argues, for example, that the termination of the Agency Agreement may have increased Ocean City's business, because it freed Ocean City from the "restrictions on Plaintiff's relationship with Cartus." (Def.'s Reply at 4.)

branding, because it casts a range over the damages potentially implicated here.

In sum, although Ocean City's evidence on damages remains far from perfect, the evidence, taken together and viewed in the light most favorable to Ocean City, suffices to create a triable issue on the question of damages. Despite this conclusion, the absence of a sufficient expert or documentary record may ultimately prove fatal to Ocean City's ability to prove damages at trial. Indeed, it appears that Ocean City has little means of definitively substantiating its damages claim. The Court, however, cannot resolve this issue on the competing and genuine evidence presented on summary judgment.

## V. CONCLUSION

In sum, Atlas' motion for summary judgment will be denied. The accompanying Order will be entered.

